The MOTORLEASE CORPORATION

v.

UNITED STATES of America.

Civ. No. 9128.

United States District Court
D. Connecticut.

March 21, 1963.

As Corrected March 26, 1963.

Norris L. O'Neill, Hartford, Conn., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., David A. Wilson, Jr., Lyle M. Turner, Herman Wilson, Department of Justice, Washington, D. C., Robert C. Zampano, U. S. Atty., New Haven, Conn., Irving H. Perlmutter, Asst. U. S. Atty., Hartford, Conn., on the brief, for defendant.

Ellis Lyons, Washington, D. C., for American Automotive Leasing Ass'n, amicus curiæ.

BLUMENFELD, District Judge.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Motorlease Corporation, seeks to recover payments of income taxes plus interest made in response to deficiency assessments for the fiscal years ended September 30, 1957, 1958, 1959 and 1960. As its name suggests, the plaintiff is in the business of leasing its automobiles to others. For each year, the taxpayer reported gains which arose from the sale of certain of those automobiles at prices in excess of their depreciated basis at the time of sale. In every such instance, the commissioner substituted the selling price for the taxpayer's basis.

The commissioner's assessments then were based on the disallowance of depreciation taken by the taxpayer during the year of sale on used automobiles to the extent that the selling price exceeded the depreciated basis at the time they were sold. The basic factual situation in this case is as simple as that. The effect of this action of the commissioner was to prevent the taxpayer from applying that part of the depreciation taken by him in the year of sale as an offset against income taxed at full rates, and accounting for it at a more favorable capital gains rate. The taxpayer contends that the action of the commissioner was unwarranted in law.

Although the parties have not filed a stipulation of facts, as suggested in the Pre-trial Order, the facts set out hereafter as found from the admitted pleadings, affidavits and briefs filed by both parties in support of their cross motions for summary judgment and from the admissions of counsel at the argument upon the motions are uncontroverted. They raise questions with respect to the proper tax treatment of amounts realized by the taxpayer from the sale of some of its depreciable assets which may appropriately be resolved by summary judgment.

The 1954 Internal Revenue Code § 167, 26 U.S.C. § 167(a), permits a taxpayer "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business * * *." What is meant by a reasonable allowance is described in the regulations promulgated by the Treasury Department.

The pertinent regulation, § 1.167(a)– 1, provides:

"Reasonable allowance. Section 167 (a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(f) and § 1.167(f)– 1. An asset shall not be depreciated below a reasonable salvage value under any method of computing depreciation. See paragraph (c) of this section for definition of salvage. The allowance shall not reflect amounts representing a mere reduction in market value."

This taxpayer utilized the common straight line method of depreciation.[1] It

---

1. Section 1.167(b)–1(a) provides for the application of the straight line method: "Application of method. Under the straight line method the cost or other basis of the property less its estimated salvage value is deductible in equal annual amounts over the period of the estimated useful life of the property. The allowance for depreciation for the taxable year is determined by dividing the

was required to estimate useful life at the time of the acquisition of each car in order to compute what proportion of depreciation should be allocated to each year it held it. This it did. The commissioner does not attack the taxpayer's estimate of useful life. This estimate determines the length of time over which the depreciation may be taken at a uniform rate. The very nature of a straight line depreciation allowance spread over the life of an asset demands the ascertainment of an estimated salvage value. Accordingly, the taxpayer was also required to deduct the estimated salvage value at the end of that useful life from its cost in order to determine what amount was to be so apportioned. This it also did. The commissioner does not attack the taxpayer's estimate of salvage value.

Regulation § 1.167(a)–1(c) presents the salvage value definition:

"Salvage. Salvage value is the amount *(determined at the time of acquisition) which is estimated will be* realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. *Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life.* * * * Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to

adjusted basis of the property at the beginning of the taxable year, less salvage value, by the remaining useful life of the property at such time. For convenience, the allowance so determined may be reduced to a percentage or fraction. The straight line method may be

depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account) be depreciated below a *reasonable* salvage value." (Italics added.)

Thus, it appears that the regulations published by the Treasury Department require only that the taxpayer *estimate* anticipated salvage value *at the time of acquisition.*

The parenthetical emphasis in the regulation upon the time when the salvage value must be determined is strengthened when viewed in historical perspective. The originally proposed depreciation regulations under the 1954 Code published in the Federal Register, 19 F.R. 6229, September 28, 1954, barely six weeks after the enactment of the 1954 Code on August 16, 1954, were followed by the second proposed regulations on November 11, 1955, 20 F.R. 8454 et seq., and thereafter by those finally adopted June 11, 1956, 21 F.R. 3985 et seq. Significantly, the italicized material in § 1.167(a)–1(c), infra, as finally adopted, did not appear in the earlier proposals.

It would be hard to find more explicit evidence of the Treasury's opinion that salvage value must be estimated as of the time of acquisition of a depreciable asset than is revealed by these extensive additions to the originally proposed regulations which are found in it when finally adopted.

Presumably, adequate meaning could not be expressed if these words were left out. The fact that the regulation was not formally adopted until almost two years after the 1954 Code was passed, under the circumstances, does not militate against the weight given to administrative opinion which is "substantially contemporaneous" with the enactment of a governing tax statute. White v. Win-

used in determining a reasonable allowance for depreciation for any property which is subject to depreciation under section 167 and it shall be used in all cases where the taxpayer has not adopted a different acceptable method with respect to such property."

chester Country Club, 315 U.S. 32, 41, 62 S.Ct. 425, 86 L.Ed. 619 (1942).[2]

Section 1.167(a)–1(c) quite expressly forbids redetermination of salvage value merely to reflect changes in the resale market or even for other causes, except where there has been a redetermination of useful life. There has been no such redetermination of useful life here, and the government does not contend that any was required. Having also conceded that the estimate of salvage value at the time of acquisition (in most cases fourteen months before the sale) was reasonable, the government, nevertheless, argues that there is no further need for giving any effect to an estimate of salvage value once the asset has been sold, for then *actual* salvage value is known and the amount subject to depreciation must be automatically reduced by the difference between the selling price and the estimated salvage value whenever the selling price exceeds the estimate.

Tax consequences upon depreciation for "exhaustion, wear and tear" are tied to property "used" in the trade or business of the taxpayer. When the property so used is sold, the allowance for depreciation comes to an end. The *sale* of the used property is another taxable event to which new and different tax consequences attach. To indicate this conceptual change,[3] a sign post in the form of a new sub-sub-section, § 1.167 (a)–8(a), was inserted into the depreciation section of the regulations by the Treasury. It reads, "(1) Where an asset is retired by sale at arms length, recognition of gain or loss will be subject to the provisions of §§ 1002, 1231 and other applicable provisions of law," all of which provide for the application of capital gains rates. There is merit to the taxpayer's argument that this constitutes an implicit recognition by the Treasury of the settled administrative practice, that where the taxpayer honestly and reasonably complies with the regulations, the actual sales price may, nevertheless, yield some gain or loss which remains to be accounted for at the rates applicable to an exchange transaction. Certainly, this sub-section does not carry the contrary implication that the Treasury was attempting to impose a radically different procedure, requiring an automatic adjustment of depreciation allowances previously taken every time a sale yielded more than what was "estimated" "at the time of acquisition," in order to reconcile every difference in the two amounts. In both Evans and Massey, both of which were considered together sub nom. Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 1424, 4 L.Ed.2d 1592, 1603 (1960), the actual sale prices of the depreciated assets were in the records before the Supreme Court. The analysis of the facts and of the applicable principles was made with a full awareness of the tax advantage between deductions and capital gains, and of the fact that not only does salvage value usually turn out not to be what a taxpayer might estimate it to be, but that there is a simple way of finding and correcting the error.[4] Despite the lack of any significantly different factual situation in those cases from the facts in this one, so far as the application of principles

**2.** Congress has never defined "salvage value." In fact, § 167 marked the first statutory appearance of the phrase "useful life." It is easy to understand why regulations encompassing an enormous amount of experience in the allowance of depreciation for tax purposes would take some time to draft.

**3.** Since capital investment in equipment is not deductible when incurred, its cost is normally offset against the proceeds of its sale in computing gain or loss. But, if depreciated by use, there is a piecemeal disposition each year, which is generally offset annually against the income which the equipment produces. Depreciation, therefore, is an ordinary deduction, not merely a factor entering into the computation of gain or loss. Hillard v. C. I. R., 281 F.2d 279, 282 (5 Cir., 1960). See Massey Motors, Inc. v. United States, supra, 364 U.S. p. 104, 80 S.Ct. p. 1418.

**4.** Cohn v. United States, 259 F.2d 371 (6 Cir., 1958), was brought to the attention of the court and received only limited consideration. Massey Motors, Inc. v. United States, supra, 364 U.S. pp. 117–118, 80 S.Ct. p. 1429.

is concerned, the Supreme Court's final statement of the correct formula to be applied in such cases did not include any rigid stricture arising from implication, proof or logical necessity that estimated salvage value and selling price must be the same. The Supreme Court concluded, p. 107, 80 S.Ct. p. 1419:

"We therefore conclude that the Congress intended that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the *estimated* salvage, resale or second-hand value. This requires that the useful life of the asset be related to the period for which it may reasonably be expected to be employed in the taxpayer's business. Likewise salvage value must include estimated resale or second-hand value." (Italics added.)

The repetition of the same words "the estimated salvage, resale or second-hand value" in the unity of one statement of congressional purpose and of how the taxpayer must go about complying with it leaves no room for ambiguity.

The effects of an estimate which does not later turn out to be absolutely accurate are not such that a taxpayer escapes taxation altogether on the difference. In fact, if his estimate of salvage value is high, so that the depreciation taken by him is less than he might have taken, viewed retrospectively, he is not permitted to recover, regulation § 1.167 (a)–10; Thomas Goggan Bros. v. C. I. R., 45 B.T.A. 218, 228 (1941), or recoup the tax paid on what he would have been allowed to deduct as depreciation, Hall v. United States, 43 F.Supp. 130, 95 Ct.Cl. 539 (1942), cert. denied 316 U.S. 664, 62 S.Ct. 994, 86 L.Ed. 1740 (1942), despite the rule in reverse that the amount of depreciation "allowable" may be applied by the commissioner to establish a lower basis from which to compute a larger capital gains tax upon the sale of the property. Beckridge Corp. v. C. I. R., 129 F.2d 318 (2 Cir., 1942).

The government relies upon a sentence in Massey Motors, Inc. v. United States, supra, 364 U.S. p. 96, 80 S.Ct. p. 1414, "It was the design of Congress to permit the taxpayer to recover, tax free, the total cost to him of such capital assets; hence it recognized that this decrease in value —depreciation—was a legitimate deduction as a business expense." Its enlargement of this brief quotation to mean that where the taxpayer recovers through depreciation deductions more than the total cost of the asset, however reasonable the projections as to useful life and salvage value may have been, he has converted ordinary deductions into capital gains, thus thwarting congressional purposes finds little support elsewhere in that case. In rejecting taxpayers' argument in the Massey case that "useful life" and salvage value should be determined by the length of the physical life of the asset, the Supreme Court held that the taxpayers must "estimate the period the asset will be held in the business and the price that will be received for it on retirement. Of course, there is a risk of error in such projections, but prediction is the very essence of depreciation accounting. Besides, the possibility of error is significantly less where probabilities rather than accidents are relied upon to produce what is hoped to be an accurate estimation of the expense involved in utilizing the asset. Moreover, under a system where the real salvage price and actual duration of use are relevant, to further insure a correct depreciation base in the years *after* a mistake has been discovered, adjustments may be made when it appears that a miscalculation has been made." (p. 105, 80 S.Ct. p. 1418, italics added) As noted above, the court's final pronouncement on the subject was that "the Congress intended that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the *estimated salvage, resale or second-hand value.*" (p. 107, 80 S.Ct. p. 1419, italics added); Hillard v. C. I. R., supra, 281 F.2d 279 n. 3. Indeed, it is clear that the commissioner did not even argue in Massey for the proposal he asserts here. In calculating the taxpayer's deficiencies, he used an estimated salvage value of $1,325.00 per car, rather than

$1,380.00, which was the actual selling price. He was not trying to eliminate all interplay between § 167 and § 1231.

The government's argument, insofar as it is based upon the regulations, is hung upon part of one sentence in § 1.167 (a)–1(c), "In no event shall an asset (or an account) be depreciated below a reasonable salvage value," and part of § 1.167(b)–0(a), "Regardless of the method used in computing depreciation, deductions for depreciation shall not exceed such amounts as may be necessary to recover the unrecovered cost or other basis less salvage during the remaining useful life of the property. The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made." But, even here, the test for allowable depreciation is still its reasonableness, emphasized by the last sentence of § 1.167(b)–0(a), which is added here: "Generally, depreciation deductions so claimed will be changed only where there is a clear and convincing basis for a change."

It cannot be disputed that strong evidence of salvage value of the automobiles sold, as of the date on which they were sold, materialized during the taxpayer's fiscal year and was known to exist at the end of the year; but the seeming contradiction between a later known sales price and a reasonably estimated salvage value is not so great as to make either an accountant or a revenue agent wring his hands in despair. Even if, as the commissioner urges, "The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made," it does not automatically follow that a price received upon the sale of a depreciable automobile, somewhat greater than estimated when it was acquired fourteen months before, established that the estimate and the depreciation based upon it was unreasonable. To illustrate: in four specific instances in this case, the commissioner disallowed depreciation respectively of $0.03, $2.82, $2.33 and $4.70. The regulations do not operate to automatically convert, cf. Oxford Paper Co. v. C. I. R., 302 F.2d 674, 678, 679 (2 Cir., 1962), an amount estimated at the time of acquisition to the amount realized upon sale. They do not require hindsight revisions. "Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels." § 1.167(a)–1(c). The guide for the taxpayer, and the standard for the commissioner, is that of reasonableness. "Reasonable allowance" is the theme for depreciation in the statute, and the regulations faithfully repeat it. See Massey Motors, Inc. v. United States, supra.

The commissioner relies heavily on Cohn v. United States, 259 F.2d 371 (6 Cir., 1958),[5] a case which has recently been put in service by the Treasury to support Revenue Ruling 62–92, 1962 Cum.Bull. 29, 30.[6] In brief, the taxpayers in Cohn sought refunds because of assessments of taxes and interest based upon the commissioner's disallowance of

---

5. The amicus curiae brief of the American Automotive Leasing Association filed with the court devotes eleven pages to an argumentative analysis of Cohn, characterizing it as a "sport" in the law, and covering more ground than I find it necessary to explore.

6. The directive part of the Revenue Ruling reads:
"Accordingly, it is the position of the Service that the Cohn case applies equally to the 1939 Code and the 1954 Code and that it is not only reasonable but proper to take the ultimate facts into consideration in determining the depreciation deduction for the year of disposition of the asset. Therefore, the deduction for depreciation of an asset used in the trade or business or in the production of income shall be adjusted in the year of disposition so that the deduction, otherwise properly allowable for such year under the taxpayer's method of accounting for depreciation, is limited to the amount, if any, by which the adjusted basis of the property at the beginning of such year exceeds the amount realized from sale or exchange."

depreciation during the fiscal years ending in 1942, 1943, 1944 and 1945 on assets they had acquired after 1941 and 1942 for flying schools engaged in training pilots under the Army Air Corps Contract Flying School Program. The taxpayers' returns treated the useful life of the assets in their business as ending on December 31, 1944 and, accordingly, they had depreciated their entire cost by that date no matter when acquired. The depreciable basis used took no account of salvage value, although the assets, costing $360,905.11, brought $131,948.92, slightly more than 36% of their cost, when sold at auction in 1945. The commissioner's assessment recomputed depreciation on the basis of his determination that some assets had a useful life of five years, and the others of ten years. The commissioner's depreciation adjustments were not upheld.

The District Judge, at first, decided that a salvage value of 10% of cost should have been taken into account by the taxpayers; but before judgment was entered, additional findings and conclusions were made as to the assets of all three schools that their reasonably estimable value and the actual salvage value realized from their sale were the same.

The effect of the application of these figures was that the depreciable part of the assets' cost had been 100% utilized in deductions taken by the taxpayers before the years in which they were sold. (p. 377) The depreciation taken in prior years was left undisturbed, however.

The factual situation in the Cohn case was somewhat unusual. No proper method of computing depreciation allowances had been adopted by the taxpayers because no anticipated salvage value at all had been subtracted from cost. Apparently treating the situation as one where a redetermination of useful life was permissible, see [8] pp. 377, 378, the District Court regarded its action as relating back only to the beginning of the tax year for which the "change" was made, and did not disturb the depreciation deductions taken in the prior years. This was affirmed on appeal. The Court

of Appeals held, p. 378, "If a redetermination is made, the depreciation is not modified for prior years, but the remaining depreciated cost is spread ratably over the new estimated remaining useful life and depreciation reductions taken accordingly for the current and succeeding years." (cited cases omitted) The rationale as expressed in the Cohn case thus was not that excessive depreciation deductions taken must be disallowed, qua deductions, for the years before the redetermination of useful life was made, because no adjustment of depreciation was made for those years. In addition, the Court of Appeals rejected the taxpayers' contention, p. 378, phrased, "although remaining useful life may be redetermined at the end of any taxable year on the basis of facts reasonably known to exist at the end of such taxable year, it is not permissible to redetermine the estimated salvage value because of subsequent appreciation in market values." Without mention of the fact that the taxpayer had not taken any salvage value into account, the Court of Appeals held, p. 378, "Depreciation involves a combination of useful life and salvage value, both estimated. If, under certain circumstances, depreciation can be reconsidered through a redetermination of useful life, it would seem logical to permit, at least at the same time, a reconsideration and redetermination of salvage value. Since a change in the depreciation allowance is not applied retroactively, such a change in the salvage value would not affect prior taxable years." Nowhere did the Court of Appeals enunciate an inflexible rule, as such, that depreciation must be disallowed for the year of the sale whenever the selling price exceeds the depreciated basis at the beginning of the year. It was coincidental in Cohn that there was no undepreciated basis left at that time.

Furthermore, Cohn does not hold that in every case the actual sale price is per se the same as the reasonably estimable salvage value determined at the time of acquisition, or even as of the beginning of the tax year in which the assets are

sold. It does not purport to set up an automatic hindsight re-evaluation which becomes a self-executing redetermination of salvage value triggered by the sale of depreciable assets. Cohn went no further than to hold that when useful life is redetermined and salvage value is thereby redetermined at the same time, a trier *might* conclude under all the circumstances, not that it was required to conclude in every case, that the amount realized by a sale during the tax year and a reasonably estimable value at the beginning of that year were the same in amount.

That what the District Court had done was intelligible to the Court of Appeals in terms of a judicial process of fact finding from evidence, rather than as the application of an administrative practice, or of an irrebuttable presumption, and that it was so regarded, is unmistakable from the last sentence of the opinion, p. 379, which reads, "If so, his findings of fact with respect to salvage value are fully supported by the evidence, are not clearly erroneous, and must be sustained." The finding of the trial court that actual salvage value and the reasonably estimable salvage value were the same was based on the weight it gave to the evidence surrounding the circumstances of the sale, and the holding of the Court of Appeals was that the evidence was sufficient.

The particular anomaly in the government's present view of the Cohn case is that the Court of Appeals showed that it was unreceptive to the construction which the taxpayer sought to put upon the government's claims, to wit, that to permit any re-adjustment of estimated salvage value would impose a heavy burden of making annual adjustments and would be disruptive of sound accounting policies, at p. 378, "But the Government is not contending that salvage value should be adjusted annually in order to conform with current market values, or that it should be adjusted at all on account of 'mere fluctuation in market value.'" It continued, impelled as if the

taxpayers' characterization of the government's claims was accurate, to reject the idea that the scope of its decision extended to every case where the sale of a depreciable asset yielded an amount greater than a reasonably estimated salvage value when it stated, p. 378, "In so far as this case is concerned the issue is whether salvage value can be adjusted at or near the end of the useful life of the asset when it is shown by an actual sale of the asset that there is a substantial difference between what was estimated and what it actually is. We are not concerned with mere fluctuations or with any fluctuations from year to year. On the contrary, we have a single and final adjustment in the closing of the books on the asset involved. Under such circumstances the practical difficulties urged upon us are largely nonexistent." "Substantial difference" considered in the context of the foregoing paragraph does not include every difference revealed solely by an inexact matching of dollar amounts. Cf. United States v. Cindrich, 241 F.2d 54, 57 (3 Cir., 1957); Magruder v. Safe Deposit & Trust Co., 121 F.2d 981, 983 (4 Cir., 1941). In the case here the commissioner concedes that whatever differences existed were reasonable.

It may also be noted that the Court of Appeals undertook to allay the taxpayers' expressed concern lest the court's decision would encourage recurring and largely unnecessary controversies with revenue agents over depreciation allowances. In the light of such reassurance, it would be disturbing if the government should seriously contend that because an adjustment is only one time and final, that, in and of itself, is a valid ground for making it. In spite of this definitive statement by the Court of Appeals of its holding, the government attempts to rely on one of the District Court's conclusions, to wit, pp. 375, 376 of 259 F.2d, "Where the actual salvage value of assets is known at the end of a tax year, depreciation is not allowable for that year on such assets to the extent that their book value at the beginning of the tax year is less than their actual sal-

vage value." The Court of Appeals was in no way concluded by the trial court's view of the law, for "When a finding is essentially one dealing with the effect of certain transactions or events, rather than a finding which resolves disputed facts, an appellate court is not bound by the rule that findings shall not be set aside, unless clearly erroneous, but is free to draw its own conclusions." Stevenot v. Norberg, 210 F.2d 615, 619 (9 Cir., 1954). See generally 5 Moore 2631. Circuit Judge Miller, the author of the opinion in Cohn, had previously noted in Imperial Oil, Limited v. Drlik, 234 F.2d 4, 11 (6 Cir., 1956), "We are more concerned with the result, reached by a reasonable process of reasoning and consistent with the evidence, than we are with which one of several suitable formulas was actually used by the juror or judge. It is not necessary for us to adopt the method used by the District Judge as a rule of law for the proper disposition of such an issue, and we do not do so." His careful framing of the issue which his court was deciding in Cohn cannot be read otherwise than as a refusal to accept the trial judge's conclusion no. 3 as a governing rule of law.

The government's reliance upon Lane v. Commissioner, 37 T.C. 188 [7] adds no support to its argument. This was also a case where no salvage value had been taken into account by the taxpayer who bought equipment and constructed improvements at a cost of $380,539.20 in the performance of a construction job begun in 1951 and completed in 1953. Although he had taken depreciation deductions of $380,341.13 he realized $187,322.50 on the sale of those assets.

Although the court held that actual salvage value determined by the sale of the depreciable assets must be used for the purpose of determining the allowable deduction, it was careful to distinguish Lane from the more usual cases of those:

"* * * taxpayers who were actually faced with the necessity of estimating a salvage value of depreciable assets at the time of acquiring the same. In the instant case, [Lane] however, the petitioner faced no such necessity. He elected to compute his profit, as we have said, on the completed profit basis. Depreciation, under that method, is an amount equal to the cost of assets less the salvage value thereof. And depreciation is not taken, under said method, pro rata over the years during which the contract is performed, but, rather, it is taken as one lump sum, in the year when the contract is completed. Therefore, salvage value of depreciable assets need not be fixed at the commencement of the contract; it must be found, and deducted from cost, when the contract is completed. It is thus seen to be totally immaterial and irrelevant, what petitioner's estimate of salvage values were when these assets were acquired." (p. 9.)

Since, in the present case, the taxpayer using the straight line method was required to, and did, estimate salvage value at the time of acquisition of the assets, the distinction, elaborated by the Tax Court in its opinion in Lane makes the considerations which are required under the completed profit method wholly inappropriate here.

The Tax Court in Lane found no more in Cohn to support the government's contention here than I do. Leaving to one side the distinction so far as methods of taking depreciation are concerned, the Tax Court in Lane went no further than to approve the use of the actual sales price as reliable evidence of salvage value. The Tax Court said:

"And, we think, the Sixth Circuit approved actual sales price an accurate yardstick for measuring sal-

---

**7.** Rouse v. Commissioner, 39 T.C. No. 7 (1962), upon which the government also relies, is simply another case where the taxpayer had not taken any estimated salvage value into account in computing the depreciation deductions he took.

vage value. In the instant case, most of the property involved was actually sold prior to completion of the contract in November; and all of it has been sold prior to the time when petitioner filed his 1953 return. *In such circumstances, we think it was correct, and fair and reasonable for the respondent to use, as he did, the actual sales prices as the measure of salvage values."* (p. 9 italics added.)

The italicized sentence merely shows that the presumptively correct determination by the commissioner was supported by the particular facts in that case. If actual sales price is always automatically the same as salvage value, this sentence was entirely unnecessary to the opinion. Thus, the Tax Court's approving citation of Cohn is carefully worded to prevent an overly-simplified, but artfully misleading, interpretation of the use of actual sales price by a fact finder. The creative administrative Revenue Ruling 62–92 reads into Cohn more than is warranted.

In open court, at the time of the hearing on these motions, the government admitted that the plaintiff's estimate of useful life was reasonable, that its estimate of salvage value was reasonable, and that its method of computing its depreciation was proper. It does not make any claim that the method of depreciation used by the taxpayer was improper or that there was any unreasonable, mistaken or improper use of any element in the method adopted by the taxpayer.

The absence of any need to pass upon policy or practical considerations is as fully apparent here as it was in Cohn. (259 F.2d p. 378) Thus, while it is no doubt true that the hindsight re-evaluation of salvage to equal the actual selling price of the asset has the merit of simplicity of administration, there are still none of the criteria among the facts of this case which either Cohn or the regulations may fairly be said to require which support the commissioner's disallowances of the depreciation taken by the taxpayer.

## Subsequent Legislation

It hardly needs to be added that subsequent legislative activity supports this position. In 1962, Congress was aware of the fact that the operation of the permissible depreciation methods under the tax laws enabled a taxpayer who sold depreciable assets held for more than six months to obtain the favorable capital gains tax rates applicable to any profits realized upon their sale. Title 26 § 1245 was aimed specifically at this narrow area of capital gain treatment on the conversion of depreciable property. Expressed congressional reasons for enactment of the provision preclude speculation and obviate the necessity for interpretation to ascertain its purpose. The portion of the Senate Report in the Revenue Act of 1962 under the heading Gain From Disposition of Certain Depreciable Property, U.S.Code Cong. & Adm.News, Vol. 2, p. 3398 begins:

"A. Reasons for provision.

"Under present law, in the case of depreciable property the taxpayer may write off the cost or other basis of the property over the period of the useful life of the asset in his hands. This cost or other basis can be written off evenly (i. e., in a 'straight line' over the asset's life) * * *. The depreciation deduction is a deduction against ordinary income. If either the useful life of the asset is too short, or the particular method of depreciation allows too much depreciation in the early years, the decline in value of the asset resulting from these depreciation deductions may exceed the actual decline. Wherever the depreciation deductions reduce the basis of the property faster than the actual decline in its value, then when it is sold there will be a gain. Under present law this gain is taxed as a capital gain, even though the depreciation deductions reduced ordinary income. The taxpayer who has taken excessive depreciation deductions and then sells an asset, therefore, has in effect con-

verted ordinary income into a capital gain.

"The President stated that our capital gains concept should not encompass this kind of income."

Additional illumination is furnished by the legislative history set forth in Evans v. C. I. R., 264 F.2d 502 (9 Cir., 1959),[8] reversed on another ground sub nom. Massey Motors, Inc. v. United States, supra:

"In amending, in 1942, section 117 of the Internal Revenue Code of 1939 by adding sub-section (j), Congress extended to taxpayers who sold at a profit depreciable assets used in a trade or business, held for more than six months, and not held primarily for sale to customers in the ordinary course of business, the favorable treatment on such profits accorded to capital gains. The legislative history of section 117(j) shows that Congress has not receded from its original purpose. Congress was aware of the Commissioner's contention that taxpayers were converting into capital gains ordinary income arising from unreasonable deductions for depreciation.

"Congress and the Treasury Department were well aware of the losses in revenue occurring under section 117(j). The report of the Business Tax Section of the Division of Tax Research of the Treasury Department submitted to the Ways and Means Committee of the House of Representatives (see 'Revenue Revisions,' 1947–1948, hearings of December 2–12, 1947, Part 5, page 3756) contained warnings against revenue losses through the benefits of capital gain treatment of profits from sale of assets subject to accelerated depreciation, and recommended that if the taxpayer elects to use accelerated depreciation, gains to the extent of the excess of accelerated over normal depreciation should be treated as ordinary income. Congress took no action. In 1950 the Treasury Department recommended to Congress that losses on the sale of depreciable business assets be treated as capital rather than ordinary losses (see Committee Reports on HR–8920, 81st Congress, Second Session). Again Congress did not act. On April 19, 1954, the Committee on Federal Taxation of the American Institute of Accountants filed with the Senate Finance Committee its recommendation number 180, with respect to section 1231 of the proposed Internal Revenue Code of 1954, 26 U.S.C.A. § 1231, as follows: 'Gain or loss of property used in the trade or business, etc.; should be treated uniformly as ordinary income or loss.' The recommendation was heard but not adopted.

"In the Revenue Code of 1954, Congress limited capital gains on sales of emergency facilities amortized under section 168, but did not limit capital gains upon the sale of assets used in a trade or business. The House report states, with respect to section 1231, 'This section is derived from section 117(j) of the present law. There is no substantive change intended but some rearrangement has been made.' " (n. 11, n. 12 omitted.)

■ For the future, the gain to the extent that it exceeds all allowable depreciation deductions, no matter whether or when taken, will be taxed as ordinary income, 26 U.S.C. § 1245. The new statutory rule applies only to sales or other dispositions beginning after 1962, although it may, when so applicable, recapture depreciation for all periods after December 31, 1961. This boun-

8. Quite obviously, Congress did not consider that the effect of the Supreme Court cases Massey and Hertz would operate to obtain for the government whatever opportunities there were for securing additional revenue presented by cases as the typical one here.

dary against the backward reach of the recapture power ought not be administratively trespassed. See Effective Date Note ffg. 26 U.S.C.A. § 1245. What Congress has done only for the future, the commissioner was not entitled to do in the past.

The plaintiff's motion for summary judgment is granted.

The defendant's motion for summary judgment is denied.

The parties are directed to submit a proposed form of judgment in accordance with this opinion within thirty (30) days.