**FRIBOURG NAVIGATION COMPANY, Inc., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 72, Docket 28165.**

United States Court of Appeals
Second Circuit.

Argued Jan. 16, 1964.

Decided July 15, 1964.

Moore, Circuit Judge, dissented.

James B. Lewis, New York City (Theodore Ness, Michael J. Nassau and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for petitioner.

William A. Friedlander, Atty. Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SWAN, MOORE and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

■ The sole issue presented by this appeal is whether a taxpayer is entitled to a depreciation deduction for the year in which a depreciable asset is sold at more than its depreciated cost. The Tax Court sustained the Commissioner's disallowance of the deduction, and the taxpayer has appealed to this court. We agree with the Tax Court's determination and affirm the judgment.

The taxpayer, Fribourg Navigation Co., operated two cargo ships in foreign commerce. One of these was the S. S. Feuer, a Liberty ship purchased in December of 1955 for $469,000. Just prior to purchasing the Feuer, the taxpayer secured a letter ruling from the Engineering and Valuation Branch of the Internal Revenue Service advising that it would accept straight line depreciation of the ship over a useful economic life of

three years, subject to change if warranted by subsequent experience. The letter ruling also advised that the Internal Revenue Service would accept a salvage value of $54,000 on the Feuer. This estimate of the Feuer's useful economic life and salvage value, concededly reasonable in December of 1955, was thrown out of kilter by a scarcity of ships resulting from the Suez Crisis of 1956–57, which sharply inflated the values of ships normally considered obsolete. In June of 1957 the taxpayer accepted an offer to sell the Feuer for $700,000, $231,000 more than it had paid for the ship a year and a half before. When the Feuer was delivered to its new owner on December 23, 1957, the contract terms were slightly modified, reducing the purchase price to $695,500.

Relying on the letter ruling, the taxpayer deducted the $54,000 estimated salvage value from the $469,000 cost and spread the $415,000 equally over a three year useful life—from December 21, 1955 to December 21, 1958. This resulted in a daily depreciation of about $378.65. On its income tax returns, the taxpayer claimed the following depreciation deductions for the Feuer:

| Calendar Year | Period of Ownership | Depreciation |
|---|---|---|
| 1955 | 10 days | $ 3,786.50 |
| 1956 | 366 days | 138,585.77 |
| 1957 | 357½ days | 135,367.24 |
| | Total | $277,739.51 |

On March 7, 1957, prior to the sale of the Feuer, the taxpayer adopted a plan of complete liquidation, which was carried out within 12 months. Since the liquidation came within the sanctuary of Section 337 of the Internal Revenue Code, the taxpayer incurred no tax liability on the capital gain from the sale of the Feuer. For information purposes only, the taxpayer reported a capital gain of $504,239.51 (the difference between the selling price and the adjusted basis after taking a depreciation allowance for 357½ days of 1957). The taxpayer reported a gross income (after cost of operations) of $391,811.31 in 1957. This was reduced to $141,193.35 after deductions of $250,617.96, including $135,367.24 for the depreciation of the Feuer in 1957.

The Commissioner disallowed the $135,367.24 deduction in full, taking the position that a taxpayer cannot depreciate an asset during the year its sale reveals that it has not depreciated. At the start of 1957 the Feuer had an adjusted basis of $326,627.73. In December of 1957 it was sold for $695,500. The Commissioner claims Congress never intended to permit further depreciation under such circumstances, and that a depreciation deduction claimed when the taxpayer knows with certainty that the asset has appreciated rather than depreciated must be disallowed as unreasonable. The Commissioner does not seek to recapture the depreciation deductions allowed for 1955 and 1956. He is content with contending only that depreciation disallowance should be limited to the year in which an asset is sold for more than its adjusted basis.

Though perhaps logically inconsistent, this position is strongly suggested by the opinion of the Sixth Circuit in Cohn v. United States, 259 F.2d 371 (1958), which first permitted the Commissioner to disallow depreciation deductions on assets sold for more than their adjusted basis. In 1941–42 the taxpayers in Cohn began to operate three flying schools to train pilots under the Army Air Corps Contract Flying School Program. The taxpayers determined that their contracts for operation of the schools would terminate at the end of 1944, and the equipment they had purchased to operate the

schools should be depreciated over a useful economic life ending on December 31, 1944. In computing their depreciation deductions, the taxpayers neglected to place any salvage value on the equipment, though operators of similar flying schools used an estimated salvage value of ten percent in establishing their depreciation schedules. One of the schools ceased its operations on August 4, 1944, and its equipment was sold at auction during that month. The property of the other two schools was auctioned off in November of 1944. Because of wartime shortages, the equipment brought substantial sums, exceeding the adjusted basis of the assets at the beginning of 1944. The Commissioner disallowed the depreciation deductions for all the years as excessive and unreasonable. The District Court found that a salvage value of 10% of the original cost should have been used in computing the depreciation schedules and that the actual sales price should have been substituted for the salvage value in the year in which the asset was sold. Only the latter holding was appealed to the Sixth Circuit, which affirmed the District Court.

The holding of Cohn has been variously construed. Some have taken a very narrow view, reading Cohn as holding only that on the peculiar facts the District Court's finding that the salvage value should be redetermined in the year of the assets' sale to reflect the sales price was not clearly erroneous. Others have considered it to lay down a rule of law that the depreciation deduction for the year in which an asset is sold must be adjusted to limit the deduction to the amount, if any, by which the adjusted basis at the start of the year exceeds the sales price. Compare Motorlease Corp. v. United States, 215 F.Supp. 356, 361–64 (D.C.Conn.1963) (rev'd on appeal, 2 Cir., 334 F.2d 617, 1964) and Note, 41 Ore.L.Rev. 159, 165–66 (1962) with Randolph D. Rouse, 39 T.C. 70 (1962); Rev. Rul. 62–92, 1962–1 C.B. 29; and Note, 37 Tex.L.Rev. 787 (1959).

Though it could have been more explicit, we think that the Cohn case adequately supports the Commissioner's position and supports affirmance of the Tax Court's decision in this case. Section 167(a) of the Internal Revenue Code states as a general rule: "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * * of property used in the trade or business * * *." Thus the dispute centers about whether it is reasonable to allow a deduction for depreciation in the year in which an asset is sold for more than its adjusted basis. We think such an allowance unreasonable, for it contravenes the basic purpose of the depreciation deduction.

Basically, our income tax is a tax on net income, and the expenses of generating income are normally considered deductible from gross income. The purpose of the depreciation allowance is to enable the taxpayer to recover the net cost of a wasting asset used in his trade or business by charging the diminution in the asset's value each year against the gross income of that year. Because our income tax system is based on annual reporting and liability and the taxpayer normally holds wasting assets for more than a year, the proper amount of depreciation to be taken each year must depend on estimates. The proper depreciation allowance "is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the property, equal the cost * * of the property * * *" Treasury Regulations, § 1.167(a)–1. See also United States v. Ludey, 274 U.S. 295, 300–301, 47 S.Ct. 608, 71 L.Ed. 1054 (1927).

The Commissioner does not claim that the depreciation schedule adopted by the taxpayer in 1955 when the Feuer was purchased was unreasonable. Rather his claim is that it is unreasonable to follow an estimate when one knows that estimate is incorrect. The Commissioner's

position finds support in § 1.167(b)–0 (a) of the Regulations in force during 1957·

"Any reasonable and consistently applied method of computing depreciation may be used or continued in use under section 167. Regardless of the method used in computing depreciation, deductions for depreciation shall not exceed such amounts as may be necessary to recover the unrecovered cost or other basis less salvage during the remaining useful life of the property. The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made."

We think the Regulations make it plain that the relevant time for assessing the reasonableness of the depreciation deduction is the end of the period for which the return is made. At the end of 1957 it hardly seems reasonable to claim that the value of the Feuer had declined below its adjusted basis.

To be sure, the Regulations also provide that the depreciation allowance "shall not reflect amounts representing a mere reduction in market value." § 1.167(a)–1. If depreciation schedules had to be revised each time an asset's market value rose or declined, an intolerable strain would be placed on accounting methods. But no such practical difficulty presents itself here. All that is required is a comparison of the asset's selling price with its adjusted basis. A sale which indicates that an estimated decline in an asset's value is greatly out of line is not a "mere fluctuation in market value," but "a single and final adjustment in the closing of the books on the asset involved." Cohn v. United States, supra, 259 F.2d at 378.

Though the increment in the Feuer's value resulted from a fortuity normally associated with capital gain, the depreciation allowance is measured by the net cost of the asset to the taxpayer. If an asset costs a taxpayer nothing for a year, the economic factors responsible for the lack of expense to the taxpayer should be of no concern in arriving at the depreciation allowance. Here the sale established with mathematical certainty that the entire cost of the ship had been recovered by the sale. No injustice results from denying the taxpayer an allowance he knows to be fictional at the time he claims it.

■ Little support for the taxpayer's position can be derived from Congressional passage in 1962 of § 1245 of the Internal Revenue Code. Section 1245 is addressed to a much broader problem than disallowance of depreciation deductions for the year of an asset's sale. The Cohn case refused to permit the Commissioner to recapture depreciation in years other than that of an asset's sale. Section 1245 permits recapture of depreciation allowed in years prior to an asset's sale by treating gain on the transfer of certain specified property to the extent of depreciation taken after 1961 as ordinary income instead of capital gains. See generally, Schapiro, Recapture of Depreciation and Section 1245 of the Internal Revenue Code, 72 Yale L.J. 1483 (1963).

The judgment of the Tax Court is affirmed.

MOORE, Circuit Judge (dissenting).

By its decision in this case and in United States v. The Motorlease Corporation, 2 Cir., 334 F.2d 617, this court not only enacts judicial legislation which the Congress itself has rejected but overturns judicial and administrative precedents of many years' standing in the field of allowable depreciation.

The law in effect in 1957, the applicable year here, provided as to "DEPRECIATION" that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in a trade or business, or (2) of property held for the production of income." (Sec. 167, Int.Rev.Code of 1954.) The basis, "for the purpose of determining

the gain on the sale or other disposition of such property," was to be the "adjusted basis provided in section 1011." Sec. 167(f).

The Regulations provide for the setting aside as a depreciation deduction an amount "in accordance with a reasonably consistent plan," "so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(f) and § 1.167(f)–1."

"Useful life," here determined by the Commissioner to have been three years, was subject to modification "by reason of conditions known to exist at the end of the taxable year" and could be "redetermined" but "only when the change in the useful life is significant." § 1.167 (b).

The other important factor, "salvage value," is defined with clarity as "the amount (determined at the time of acquisition) which is estimated will be realized upon sale or other disposition—" § 1.167(c)–1. The Regulation contains the injunctions that "Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels," and that "Salvage value must be taken into account in determining the depreciation deduction * * *" The time period during which depreciation is allowable is from the time "when the asset is placed in service" until it "is retired from service." Proportionate parts of one year's depreciation are allowable for the first and last years during which the asset is in service. § 1.167 (g)–10.

These underlying and controlling legal principles are clear. Their application to the facts of this case are (or should be) equally clear.

The asset or property is the S. S. Feuer. Its acquisition date was December 21, 1955—the price $469,000.

The Commissioner accepted "Useful life" as three years and salvage value as $54,000. The "reasonably consistent plan" required the setting aside of $378.65 a day for depreciation. If this were done, the "aggregate of the amounts set aside" ($415,000) "plus the salvage value" ($54,000) would equal the cost ($469,000).

During 1957 the S. S. Feuer earned some $289,340 as gross profit. To achieve this profit the Feuer had to be used and after each day of its use it had suffered wear and tear (depreciation) to the extent of $378.65. The $289,340 was not the net income on which the petitioner under the law was required to pay taxes. Its obligation rested upon net income and net income was obtained only after depreciation ($135,367.24) was deducted. Thus far there can be no variance in thought or legal result—even by the Commissioner, the Tax Court or the majority.

But just as our much vaunted system of law on a national basis can be so easily ignored and repudiated both by judicial and extra-judicial fiats, even more so is this true on an international basis. International law and contract to the contrary, the Suez Canal was closed to shipping in the latter part of 1956. Suddenly the price of ships soared, petitioner chose to forego the balance (approximately one and a half years—or one-half of the agreed-upon useful life) of the contemplated three-year reasonable plan period and sold the Feuer in June 1957 for $700,000 (actually $695,500 on closing).

The tax computation should have been simple. The cost ($469,000) less depreciation to the date of sale ($277,739.51) enabled petitioner because of its sale for $695,500 to obtain a capital gain of $504,239.51, which petitioner reported.

Particularly important is it to note that although the Suez crisis had radically affected the shipping situation and ship values, the Commissioner did not avail himself of the remedy of modification of useful life and after such redetermination then, but only then, of a redetermination of salvage value. Actually

his own regulation prevented him from changing salvage value "merely because of changes in price levels."

Faced with this insurmountable barrier of Congressional enactment, precedent, and regulation, the Commissioner resolved the problem by the simple and much-used device of amending the statutes without the aid or even participation of Congress. To the depreciation allowance section he merely added in substance the words "except in the event that the asset shall be sold prior to the expiration of its useful life, in which event no depreciation shall be allowed for the year in which such sale is made if the price realized exceeds the depreciated cost at the beginning of such taxable year."

There would have been nothing wrong with such a statute; in fact, the Treasury had been trying to have similar provisions enacted for years. If, however, under our three branches of government system, the legislative branch does not function to the satisfaction of the executive and judicial branches, it is apparently incumbent on the latter two to take over the legislative powers. To be sure the taxpayer had planned his business transaction relying on the law as it was on the books at the time but sooner or later taxpayers must learn not to rely upon Commissioner's rulings, acquiescences, prior audits—or even Commissioners and courts.

What possible rationale is available for the result reached by the majority? They first infer that the Commissioner is being quite magnanimous in being "content" with only a 1957 disallowance as if taxes and the law were to depend on Commissioners' whims, caprices and contentment. They recognize that in so doing that the Commissioner was "perhaps logically inconsistent" as indeed he was. In enacting his own *ex post facto* legislation, he might just as well have had a sale for more than cost eliminate all depreciation for three years or even from the date of acquisition.

To arrive at its result the majority relies exclusively on what it can only call a strong suggestion in Cohn v. United States, 259 F.2d 371 (6th Cir. 1958). It ignores (as it must) the many Supreme Court decisions and the statutes and regulations leading to a contrary result. When the Cohn case is read, no principle is found therein which could support the Commissioner's ruling. The taxpayers in Cohn had not fixed any salvage value for their property at the end of its useful life. For this value the District Court chose the sale price. There was no holding in Cohn that sale price during the course of useful life (here at the half-way point) should eliminate all depreciation in the year of sale. Nor can Cohn possibly be stretched to stand for the proposition that any "reasonably consistent plan" adopted by a taxpayer.is to be considered as abrogated by a sale. Any such conclusion would be in specific disregard of the statutes and regulations which provide for the methods of redetermination of useful life and salvage value.

In Randolph D. Rouse, 39 T.C. 70 (1962) (the Tax Court here held it "necessary to recognize the Rouse case as dispositive of the question presented in this case") relied upon Cohn. Depreciation was disallowed only as to the houses which Rouse had sold. Since he had not adopted any "reasonably consistent plan" or estimated any salvage value at the time of acquisition a situation somewhat similar to that in Cohn existed. Neither set of facts leads to a result which should be controlling or even persuasive here.

The Tax Court assumed, erroneously and without any supporting basis in my opinion, that "changes in economic conditions have brought about new considerations by the courts of the old, well-established *rules relating to depreciation* allowances in the light of the rising market prices of used assets and the corresponding realization of large gains upon the resale of such used assets." Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960) and Hertz Corp. v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960) are cited as examples for

this proposition. Actually neither case justifies any such conclusion. Both cases involved taxpayers whose business experience enabled them to determine an estimated salvage value based upon sales long before the end of the physical life of the automobiles used in their businesses. Instead of declaring the principle that sale automatically disqualified a taxpayer from claiming depreciation if the sale price was higher than the depreciated value at the beginning of the year, the Massey case, as to one of the taxpayers, used the estimated salvage value of $1,325 per car instead of the actual sales price of $1,380. Had the Supreme Court wished to declare the principle now urged by the Commissioner, it had every opportunity to do so merely by taking the actual sales price. However, it did not.

A thorough and well reasoned analysis of the depreciation problem is set forth in the trial court's decision in The Motorlease Corporation v. United States of America, 215 F.Supp. 356 (D.Conn. 1963). Although a panel of this court "On the authority of, and for the reasons given in Fribourg Navigation Co. v. Commissioner, 2d Cir., Docket No. 28165, decided today," reversed Motorlease, this case in reality supplies neither reasons nor authority. Motorlease reaches its result by saying "neither the Code nor the regulations are dispositive of the issue." To ignore the tax law as clearly written and the interpreting regulations is quite essential to a decision in contravention of such laws. This court in Motorlease does not believe that the transmutation of ordinary income into capital gains should be encouraged. Here is another example of the judicial enactment of a law which Congress itself over a long period of years had rejected. As pointed out in Evans v. Commissioner, 264 F.2d 502, 513 (9th Cir. 1959), rev'd on another ground sub nom. Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411 (1960), "The legislative history of section 117(j) shows that Congress [had] not receded from its original purpose. Congress was aware of the Commissioner's contention that taxpayers were converting into capital gains ordinary income arising from unreasonable deductions for depreciation." After reviewing various legislative attempts to have gain treated uniformly as ordinary income the court added tersely, "The recommendation was heard but not adopted." 264 F.2d at 514.

In Motorlease the Commissioner did what he did not do in Massey. He took sale price as a new and substituted salvage value despite the specific requirement that it was to be "determined at the time of acquisition." Thus Motorlease as decided by this court in substance and actuality goes contrary to the decisions of the Supreme Court in Massey and Evans.

The factual distinction which makes Fribourg, even as the majority decide it, completely inapplicable to Motorlease, is that Fribourg admittedly does not deal with a business which consisted of short time use of property and its sale before the expiration of its physical life. Motorlease was analogous to, and should have been controlled by, Massey, Evans and Hertz. Yet there is no consideration of, or even mention of, those important cases or the legal principles declared therein.

Another series of illuminating beacons the light of which is more than adequate to reveal the right path are recent district court cases from other circuits.

In Wyoming Builders, Inc. v. United States, 227 F.Supp. 534, D.C.D.Wyo., the court was confronted with a refund case involving the disallowance of depreciation on property sold two months before the close of the taxpayer's fiscal year (November 1, 1957—October 31, 1958). The property, an Air Force base housing project, had been set up on a seventy-five year lease basis, all improvements to remain the property of the government upon expiration or termination. When the property was sold to the government in 1958, the taxpayer, as here, reported as a capital gain the difference between the sale price and the cost less eight

years' depreciation. The court considered the applicable statutes and regulations as well as the Cohn case and concluded that the government's theory that no depreciation occurred in the year of sale was untenable, saying in part:

> "Depreciation occurs by use; the use of the property by the taxpayer until September 1, 1958, when the sale took place, resulted in a continued depreciation of the property until September 1, 1958. The expense of using the property was properly allocated by the taxpayer to the period of time which was benefited by that asset, that is, from the beginning of the fiscal year in issue until the date of the sale. Depreciation is the measure of the cost of that part of the assets which has been used up or gradually 'sold' through wear and tear." United States v. Ludey, 274 U.S. 295, 301, 47 S.Ct. 608, 71 L.Ed. 1054 (1927).

The conclusions of the court in Wyoming Builders are so consonant with the law that it is impossible to conjure up countervailing arguments. The court held that "Neither the law nor the regulations permit this court to substitute the term 'sale price' for the regulation's term 'reasonable salvage value'," and that "to sustain the disallowance of taxpayer's depreciation deduction would require an unwarranted judicial extension of the Code and Treasury Regulations." The court believed, as do I, that, if the law is to be changed, "Congress, not the Court, must enact adequate controls and set the standards."

The history of the Wier Long Leaf Lumber Co. case, 9 T.C. 990 (1947) and the Commissioner's acquiescence (1948–1962), his non-acquiescence (1962) and its affirmance and partial reversal on other issues, 173 F.2d 549 (5th Cir. 1949), is relevant here. The Tax Court held that the sale of depreciated automobiles did not preclude any depreciation allowance in the year of sale and that "mere appreciation in value due to extraneous causes [here the Suez situation]

has no influence on the depreciation allowance, one way or the other."

Kimball Gas Products Co. v. United States, 63–2 U.S.T.C. ¶ 9507, W.D.Tex. 1962 was brought for a refund for overpayment of taxes due to the Commissioner's disallowance of depreciation in the year of sale (1959) of properties acquired in 1955 which for depreciation purposes had useful lives of seven years. The Commissioner disallowed one-half of the depreciation claimed in the year of sale. The court held that the taxpayer was entitled to the full depreciation and a tax refund.

The taxpayer in S & A Company v. United States, 218 F.Supp. 677 (D.Minn., 1963), a company manufacturing and selling outboard motors, sold its land and depreciable assets on April 1, 1956 to a company which continued the business. It claimed deduction for depreciation from September 1, 1955 to April 1, 1956 in its 1955–1956 fiscal year. The issue framed there was identical with the issue here. The court reviewed in detail the history of the tax laws material to the subject, the Regulations, the Massey, Hertz, Cohn and Wier Long Leaf Lumber cases and came to the conclusion that the Commissioner improperly disallowed the deduction. In the course of its opinion the court pointed out the distinguishing features of the Cohn case (assuming it to be correct), namely, that although "a sale of an asset at the end of its useful life for an amount in excess of its undepreciated cost at the beginning of the year of sale will justify a redetermination of salvage value," it is equally clear that the Tax Court held that sale of assets prior to the end of "useful life" at a price in excess of undepreciated cost at the beginning of the year of sale does not justify a determination of salvage value because the excess of price over cost is mere appreciation in value.

Refutation cannot be found in saying that these are only district court decisions. They are decisions which apply the tax statutes as they were written and the Supreme Court cases for the prin-

ciples expounded therein. They do not attempt to ascribe to Congress an intent not enacted into law. Rather the legislative history has disclosed that Congress had been aware of the problem and had intentionally chosen not to act.

The fallibility of the majority opinion is that it completely ignores that law. The majority say "Because our income tax system is based on annual reporting * * * the proper amount of depreciation to be taken each year must depend on estimates." They should have taken notice of the statutory words requiring that salvage value be "determined at the time of acquisition"—of necessity, an estimate. They then interpret the Commissioner's claim to be that it is "unreasonable to follow an estimate when one knows that estimate is incorrect." To impute such a claim to the Commissioner is to imply that he is unable to read, understand and follow the specific provisions of the law under which he can always seek to rectify an incorrect estimate. Instead of pursuing such a remedy here, the Commissioner concedes the accuracy both of useful life and the salvage value "determined at the time of acquisition."

Finding no support in law for its position and forced to concede that "the increment in the Feuer's value resulted from a fortuity normally associated with capital gain," the majority satisfy themselves with the belief that "no injustice results from denying the taxpayer an allowance he knows to be fictional at the time he claims it." Any such legal philosophy has the effect of writing depreciation allowances and depreciation as a matter of sound accounting out of the tax laws. Possibly they intend by their opinion to do so because under such circumstances they say "the economic factors responsible for the lack of expense to the taxpayer should be of no concern in arriving at the depreciation allowance." This approach can scarcely be reconciled with their comment that "If depreciation schedules had to be revised each time an asset's market value rose or declined, an intolerable strain would

be placed on accounting methods." It was for this very reason that the Regulation, § 1.167(c), provided that "Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels." Of course, sales price can easily be compared with the depreciated cost at the beginning of the year. But there is no law or regulation which declares that in such event no depreciation shall be allowed if the sales price is higher. Therefore, because this decision seems to be completely at variance with the statutes and the applicable decisions, I must dissent.