**WYOMING BUILDERS, INC., Plaintiff,**

v.

**The UNITED STATES of America,
Defendant.**

**Civ. No. 4629.**

United States District Court
D. Wyoming.

March 25, 1964.

Byron Hirst and Richard V. Thomas,. of Hirst & Applegate, Cheyenne, Wyo.,. appearing as attorneys for plaintiff.

Robert N. Chaffin, U. S. Atty., Cheyenne, Wyo., and Burton A. Schwalb,. Atty., Tax Div., Dept. of Justice, Washington, D. C., appearing as attorneys for defendant.

KERR, District Judge.

Taxpayer brings this action pursuant to Section 1346(a) (1) of Title 28 United States Code, to recover federal income taxes in the amount of $56,225.34 plus $5,282.10 interest, allegedly erroneously and illegally assessed and collected by the government for taxpayer's last fiscal year beginning November 1, 1957 and ending October 31, 1958. The controversy arose as a result of defendant's. disallowance of plaintiff's deduction of $118,333.72 for depreciation of its property sold September 1, 1958. The question which this court must determine is. whether depreciation is allowable in the year of the sale when the sale price exceeds the adjusted basis or depreciated cost of the property as of the beginning of the fiscal year.

Taxpayer corporation was organized in June 1950 for the purpose of constructing and operating the Wherry Housing Project for living quarters. of

military and civilian personnel at F. E. Warren Air Force Base, Cheyenne, Wyoming. It was dissolved in October 1958 after it sold the property to the United States Air Force on or about September 1, 1958. Taxpayer's president, its last Board of Directors, and its trustees in dissolution bring this action on behalf of the corporation to determine its income tax liability for the fiscal and taxable year ending October 31, 1958. It is the contention of the taxpayer that the government erroneously and unlawfully denied its claim for depreciation deduction claimed in its income tax return for the fiscal year ending October 31, 1958.

Unique features distinguish this case from others which were concerned with the issue of allowable depreciation. Taxpayer was a lessee of the United States. It owned merely a leasehold interest, the equity of which it ultimately sold to the United States for a sum estimated to be its replacement cost.

The lease instrument executed October 25, 1950, by the Secretary of the Air Force and taxpayer, recites that the leased lands were "to be used for the purpose of erecting, maintaining and operating a housing project * * *". The original cost of the project was $3,964,265.51. The lease provided that the taxpayer lease all units in the project in accordance with the specified terms and conditions. It stated that the lessee should neither transfer nor assign the lease without prior written approval of the Secretary of the Air Force. Lessee was not empowered to sell any of the property covered by the lease. By its terms the "buildings and improvements erected by the Lessee, constituting the aforesaid housing project, shall be and become, as completed, real estate and part of the leased lands, and public buildings of the United States, leased to Lessee for the purpose of serving the governmental and public purpose of providing military housing * * *". Upon the expiration of the lease or upon termination before its seventy-five year term, all improvements made upon the leased premises were to remain the property of the Government without compensation.

On or about December 28, 1956, the Air Force notified taxpayer of its intention to acquire all Wherry projects and offered to negotiate for the sale of taxpayer's leasehold interest. The alternative to negotiation was acquisition of the lands by condemnation. Eventually, the sale of the project to the United States Air Force was negotiated for the sum of $4,436,706.76. This purchase price, based on replacement cost estimates, conformed to 42 U.S.C. § 1594a. In the Purchase Agreement dated August 28, 1958, the property sold was described as "Lessee's equity in the Wherry housing project", and also as lessee's right, title and interest in the leasehold estate and in all of the real and personal properties.

On its income tax return for the fiscal year ending October 31, 1958, taxpayer reported gain on the sale of the property as follows:

SALES PRICE .................................$4,436,706.76
Less adjusted basis of:
  Original cost .....................$3,964,265.51
  Less depreciation through 10/31/57    806,058.95
    depreciation for FYE 10/31/58       118,333.72
  Costs of sale ......................   17,030.54   3,056,916.52
  G A I N .......................................$1,379,790.24.

At the beginning of the fiscal year in question, November 1, 1957, the adjusted or depreciated basis in the property was $3,158,206.56. The difference between the depreciated basis and the sales price was $1,278,500.20. The government conclud-

ed that at the close of the year of the sale the actual salvage value of the property was the sale price of $4,436,706.76, and that the taxpayer knew such actual salvage value to be far in excess of the adjusted basis of the property at the beginning of the fiscal year. The Internal Revenue Service therefore, disallowed the claimed depreciation deduction of $118,333.72 and assessed additional income tax against taxpayer. Taxpayer paid the $56,225.34 assessment and the $5,282.10 interest and duly filed its claim for refund for $61,507.44, which claim was denied on the ground that no depreciation was allowable in the year of the sale. This suit followed in due course.

For the fiscal year ending October 31, 1958, as in the years prior thereto, taxpayer filed its returns on the accrual basis of accounting. The estimated useful lives of the leasehold improvements being shorter than the remaining period of the lease, taxpayer utilized depreciation as required by Treasury Regulation Section 1.167(a)–4. Taxpayer's depreciation formula for federal corporation income tax purposes, was cost, less the estimated salvage value of zero, divided by the estimated useful life of the assets. According to this formula, taxpayer computed its depreciation from the beginning of the fiscal year on November 1, 1957, to the date of the sale, and deducted $118,-333.72 for depreciation for the fiscal year from November 1, 1957 to October 31, 1958. The parties have stipulated that if the court finds that taxpayer is entitled to a deduction for depreciation for the taxable year beginning November 1, 1957, and ending October 31, 1958, the correct amount of depreciation allowable is $118,333.72. Thus, accepting the amount of depreciation claimed by taxpayer as reasonable, if it is found to be allowable, the government does not question the costs paid by plaintiff for the assets, nor the useful lives of the assets as estimated by plaintiff, nor the formula by which plaintiff computed the depreciation. Consequently, the court is concerned solely with the narrow question of the deductability of depreciation in the year of the sale.

This case calls for the construction of Section 167 of the Internal Revenue Code of 1954, and Sections 1.167(a)–1 subsections (a), (b) and (c) of Treasury Regulations on Income Tax (1954 Code). 26 U.S.C. § 167, and 26 C.F.R. Section 167 (a)–1. Treasury Regulations Section 1.167(b)–O (a) is not material in this case as the reasonableness of the amount of the claimed depreciation is not in issue. I am not applying the Departmental ruling in Rev.Rul. 62–92, 1962–1 Cum. Bull. 29, as I believe that income tax liability cannot be determined retroactively, and I consider the holding of the case of Cohn, et al. v. United States, 259 F.2d 371, 6 Cir., (1958), as not decisive of the facts before me.

The government predicates its disallowance of the deduction for depreciation on the argument that the taxpayer "did not suffer" any depreciation in the year of the sale. Under Section 167 of the 1954 Code, depreciation deduction is allowed for the exhaustion, wear, tear, and obsolescence of property used in the trade or business or of property held for the production of income. That allowance must be reasonable. The government's theory that no depreciation occurred in the year of the sale is patently not based on Section 167 of the Code which does not qualify or eradicate the allowable depreciation according to the effects or results of the sale of the assets of the taxpayer. Depreciation occurs by use; the use of the property by the taxpayer until September 1, 1958, when the sale took place, resulted in a continued depreciation of the property until September 1, 1958. The expense of using the property was properly allocated by the taxpayer to the period of time which was benefited by that asset, that is, from the beginning of the fiscal year in issue until the date of the sale. Depreciation is the measure of the cost of that part of the assets which has been used up or gradually "sold" through wear and tear. United States v. Ludey, 274 U.S. 295, 301, 47 S.Ct. 608, 71 L.Ed. 1054

(1927). The purpose of depreciation is to compensate the taxpayer for the "gradual sale" of the assets. The taxpayer is attempting to do no more than effectuate this purpose. It is not gaining an improper profit from the sale of its leasehold interest due to the claimed depreciation deduction in the year of the sale. Its profit is due to the appreciation of the property at the time of the sale, and to the fact that the sale price reflects the replacement cost of the property. The purchase price exceeded the original cost of the project without any deduction for depreciation during any of the period of its use.

Treasury Regulation on Income Tax Sec. 1.167(a)–1(a) provides that reasonable allowance will be made for the exhaustion, wear, tear and obsolescence of the property used in the trade or business or held by the taxpayer for the production of income. Reasonable allowance is defined as "that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan * * * so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property * * *". There is no evidence that the amount set aside by the taxpayer as depreciation will, at the end of the estimated useful life of the property, exceed the cost of the property.

Section 1.167(a)–1(a) does not prohibit taxpayer's depreciation deduction just because the purchase price exceeded the adjusted basis. The only prohibitions contained in Section 1.167(a)–1(a) are that the allowance shall not reflect amounts representing a mere reduction in market value, and that assets shall not be depreciated below a reasonable salvage value. Taxpayer's depreciation did not violate this regulation by depreciating the property below what ultimately became the purchase price. Neither the law nor the regulations permit this court to substitute the term "sale price" for the regulation's term "reasonable salvage value".

According to Treasury Regulation, Sec. 1.167(a)–1(c), salvage value is determined at the time of acquisition of the property. It is, necessarily, an estimate. Taxpayer made the estimate and the government did not and has not objected to the application of a zero salvage value to the formula for depreciation. Salvage value as defined by the regulation is an estimated amount which "will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer". The argument that the salvage value is automatically transformed into the actual known sale price is an unreasonable dilation of the concept of the "estimate" required by the regulation. This court will not emasculate the regulation by changing the word "realizable" to "realized".

Sec. 1.167(a)–1(c) of the Treasury Regulations does not require that salvage always have a value and that it cannot be a zero value. The regulation merely requires that salvage value be "taken into account" in determining the depreciation deduction. Taking into account salvage value, therefore, as defined in the regulations, it is clear that the facts of this case absolutely preclude the taxpayer from enjoying or anticipating any salvage value. It had to be zero at all times. Under the terms of the lease the property belonged to the government; it could not, therefore, be sold or retired from service, or disposed of by the taxpayer upon his own volition. The taxpayer could not determine that the property was no longer useful to the business of the corporation. Not one of the characteristics of salvage value as defined in Section 1.167(a)–1 (c) is present in the case before me. Taxpayer could never expect to receive any amount for the assets by retiring them, discontinuing them, or disposing of them. The sale or disposition of the property contemplated by this regulation is a normal re-sale or second-hand sale usually found in business operations. Taxpayer could not estimate the time of disposal of the property. cf.

Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). The sale in the case before me was made pursuant to a policy adopted by the Air Force to acquire all Wherry projects. The maximum purchase price was fixed by Congress and reflected the replacement cost, not the re-sale or second-hand value of the property.

The Massey Motors case, supra, is relied upon in support of the contention that more than a zero salvage value must be attributed to taxpayer's property when a substantial sum of money was actually received for it. In the automobile leasing cases, of which Massey is one, part of the taxpayer's business was the plan to resell the automobiles at a time and under circumstances selected by the taxpayers. A re-sale or second-hand value of their assets, therefore, was realizable when taxpayers acquired the automobiles. That was their modus operandi. The Massey case involved the useful life of automobiles when the taxpayer knew that he would sell them before the expiration of their actual physical lives. Such is not the factual situation before me.

Taxpayer's depreciation deduction was disallowed principally on the government's application and interpretation of the case of Cohn v. United States, 6 Cir., 259 F.2d 371 (1958). Like the automobile leasing cases, the issue in that case involved the useful life of the assets which issue is not in dispute in the case at bar. The Cohn case did not establish the inflexible rule applicable to all cases that "an automatic hindsight re-evaluation * * * becomes a self-executing redetermination of salvage value triggered by the sale of depreciable assets". The Motorlease Corporation v. United States of America, D. Conn., 215 F.Supp. 356 (1963). The Cohn case applies to factual situations where "property may still have some value when it has completed its usefulness to the business, which will be realized by the taxpayer by its sale at the end of its useful life * * * *". In the case before me the leasehold interest had not completed its usefulness to the taxpayer. The project continued operations after the sale. It was a going concern; only the operator was changed. The Cohn case set up a yardstick by which salvage value, under certain circumstances, might—not must —be redetermined. It did not decree that the sale price must, under all circumstances, automatically become the salvage value.

■ Accepting the amount of depreciation claimed by taxpayer, the government has not actually contested the reasonableness of the $118,333.72. Even though it has not disapproved the zero salvage value embraced in taxpayer's depreciation formula, the government suggests the necessity of a redetermination of the salvage value after there is a known sale price. Such redetermination may be made only if the useful life of the property has been redetermined. Treas.Regs. Sec. 1.167(a)–1(c); S. & A. Company v. United States, D.Minn., 218 F.Supp. 677 (1963). The government has made no redetermination of the useful life of the property nor has it challenged the useful life as adopted by the taxpayer in the computation of its depreciation. Treasury Regulation Sec. 1.167(a)–1(b) provides that "estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination". No clear and convincing basis for redetermination of the useful life has been proffered by the government.

■ As I construe the foregoing statutes and regulations, and as I view the facts before me, it is my opinion that the sale price paid by the Air Force to taxpayer does not reflect a reasonable salvage value of the property below which the taxpayer may not depreciate it. Salvage value connotes something saved; something left over; whereas the Air Force's purchase price was purposefully created on the basis, not of value remaining in the property at the time of the sale, but on the estimated replacement cost to the government. To sustain the disallowance of taxpayer's depreciation

deduction would require an unwarranted judicial extension of the Code and Treasury Regulations.

If it is necessary, in the future, to reach allegedly substantial tax-free capital gains enjoyed by taxpayers in the future, Congress, not the Court, must enact adequate controls and set the standards. The taxpayer properly computed its depreciation according to the law and regulations and is entitled to its claimed deduction of $118,333.72 for depreciation during its fiscal year beginning November 1, 1957, and ending October 31, 1958.

The taxpayer is entitled to judgment in the amount claimed in its complaint, together with interest as provided by law.

This opinion sufficiently states the findings of fact and conclusions of law of the Court. Further findings of fact and conclusions of law are not necessary.

The parties are directed to submit a proposed Judgment in accordance with this opinion within ten (10) days.