Moses Lake Homes, Inc., Cliff Mortensen, Liquidating Trustee, et al. [1] v. Commissioner. Moses Lake Homes, Inc. v. Commissioner
Docket Nos. 90962-90964.
United States Tax Court
T.C. Memo 1964-289; 1964 Tax Ct. Memo LEXIS 48; 23 T.C.M. (CCH) 1756; T.C.M. (RIA) 64289; November 5, 1964
*48 Petitioners were engaged in the operation of Wherry Housing Projects located on Larson Air Force Base. On March 1, 1958, the United States Department of the Air Force commenced a condemnation suit, thereby acquiring title to the leasehold estates held by petitioners. Held: 1. Petitioners are entitled to deduct depreciation on leasehold improvements for a portion of the years in which condemnation occurred. Wyoming Builders, Inc. v. United States, 227 F. Supp. 534 (D. Wyo. 1964), on appeal (C.A. 10, May 28, 1964), and Macabe Company, Inc., 42 T.C. 1105, followed. 2. Petitioners are entitled to deduct depreciation for the period March 1, 1958 through March 31, 1958, during which they remained in possession of the premises. John P. Lycette, Jr., 400 Hoge Bldg., Seattle, Wash., for the petitioners. Richard H. M. Hickok, for the respondent. WITHEY
Memorandum Opinion WITHEY, Judge: The respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Fiscal year
Petitioner
ended
Deficiency
Moses Lake Homes
April 30, 1958
$23,848.27
April 30, 1959
3,876.95
Larsonaire Homes
June 30, 1958
7,840.73
Larson Heights
June 30, 1958
23,644.16
June 30, 1959
226.81 The *49 issues presented for our decision are (1) whether petitioners Moses Lake Homes, Larsonaire Homes, Inc., and Larson Heights, Inc., are entitled to deduct depreciation on leasehold improvements for a portion of their fiscal years ended April 30, 1958, June 30, 1958, and June 30, 1958, respectively, during which their leasehold estates were taken by the United States air Force through condemnation proceedings, and (2) in the event we hold that petitioners are entitled to claim depreciation deductions on their leasehold properties from the beginning of their fiscal years in question until March 1, 1958 (when title to the leaseholds vested in the Air Force), whether they are entitled to deduct depreciation on the improvements during the period March 1, 1958 through March 31, 1958, while they remained in possession thereof. All of the facts have been stipulated and are found accordingly. Petitioner Moses Lake Homes, Inc., sometimes hereinafter referred to as Moses, was incorporated under the laws of the State of Washington on May 1, 1950. It kept its books and prepared its income tax returns on an accrual method of accounting with its fiscal year ending April 30. Moses filed income tax returns *50 for its fiscal years ended April 30, 1958 and 1959 with the director at Tacoma, Washington. Petitioner Larson Heights, Inc., sometimes hereinafter referred to as Larson, was incorporated under the laws of the State of Washington on July 24, 1954. It kept its books and prepared its income tax returns on an accrual method of accounting with its fiscal year ending June 30. Larson filed income tax returns for its fiscal years ended June 30, 1958 and 1959 with the director at Tacoma, Washington. Petitioner Larsonaire Homes, Inc., sometimes hereinafter referred to as Larsonaire, was incorporated under the laws of the State of Washington on July 31, 1955. It kept its books and prepared its income tax returns on an accrual method of accounting with its fiscal year ending June 30. Larsonaire filed an income tax return for its fiscal year ended June 30, 1958, with the director at Tacoma, Washington. At all times here material the outstanding capital stock of each of the petitioners was as follows: Moses
Larson
Larsonaire
Common
1,000
3
3
Preferred
100
100
100
During the years here pertinent the outstanding common stock of each of the petitioners was held as follows: Moses
Larson
Larsonaire
shares
shares
shares
Cliff Mortensen
666 2/3
2
2
Frank Henderson
333 1/3
1
1
All *51 of petitioners' outstanding preferred stock was held by the Federal National Mortgage Association until February 25, 1959, at which time each of them redeemed its outstanding preferred. Petitioners were each engaged as sponsors of Wherry Housing Projects located on Larson Air Force Base in Grant County, Washington, under leases executed with the Secretary of the Air Force. Moses executed its lease with the Air Force on May 31, 1950; Larsonaire signed its lease on August 6, 1953; [2] and Larson executed its lease on August 2, 1954. Each of the Air Force leases provided generally that the lessee named therein was to erect, maintain, and operate a rental housing project for a period of 75 years. Each of the above-mentioned leases further provided as follows: 5. That the Lessee shall neither transfer nor assign this lease without the prior written approval of the Secretary of the Air Force. * * * 6. That the Lessee shall at all times exercise due diligence in the protection of the leased premises against damage or destruction *52 by fire or other causes. * * *
8. That the Lessee shall pay to the proper authority, when and as the same become due and payable, all taxes, assessments, and similar charges which, at any time during the term of this lease, may be taxed, assessed or imposed upon the Government or upon the Lessee with respect to or upon the leased premises. * * *
11. [3] The buildings and improvements erected by the Lessee, constituting the aforesaid housing project, shall be and become, as completed, real estate and part of the leased lands, and property of the United States, leased to Lessee for the purpose of serving the governmental and public purpose of providing military housing in accordance with Title VIII of the National Housing Act * * *
13. That the Lessee shall, at any time after there is no Federal Housing Administration insured *53 mortgage on the property and the leased premises are not under the control of the Commissioner, adhere to such standards of maintenance and repair of the housing project as shall be mutually agreed upon between the Lessee and the Commanding Officer; that the Lessee shall observe and perform in accordance with all the laws, ordinances, rules and regulations relating to health and sanitation for the time being applicable to the said leased premises; and will indemnify and save harmless the Government against all actions, suits, claims and damages by whomsoever brought or made by reason of the failure to keep said buildings and improvements in good order, condition and repair * * *
15. The Government shall not be responsible for any damage to property or injury to person arising out of the use or occupancy of the leased premises by the Lessee or any sublessee, and the Lessee shall indemnify and save the Government harmless from any and all claims for any such damage or injuries * * *
20. That the Lessee, during the term of this lease, will, at its own cost and expense, insure and keep insured against fire the buildings that may hereafter be erected on the leased premises in an amount to *54 be determined by the Government, payable both to the Lessee and any security holder, jointly as their respective interests may appear. * * * Pursuant to the above-described leases, Moses constructed 400 housing units, Larson constructed 200 housing units, and Larsonaire built 200 units. In order to finance the costs of construction petitioners each obtained mortgage loans insured by the Federal Housing Administration. After completion of the buildings and improvements, they operated the rental housing projects in the manner contemplated by the leases until April 1, 1958. On February 27, 1958, the owners of the outstanding common stock of petitioners adopted a resolution of dissolution and appointed Cliff Mortensen as liquidating trustee with authority to liquidate Moses, Larson, and Larsonaire. The trustee completed such liquidations as nontaxable transactions under the provisions of section 337 of the Internal Revenue Code of 1954. On March 1, 1958, the United States Department of the Air Force filed a declaration of taking and commenced a condemnation suit in the United States District Court for the Eastern District of Washington, Northern Division, thereby acquiring title to the *55 leasehold estates held by Moses, Larson, and Larsonaire subject to outstanding mortgages in the amounts of $2,895,259.26, $1,568,809.02, and $1,701,947.59, respectively. On that date the Department of the Air Force deposited with the United States District Court $253,000 as estimated just compensation to petitioners for their interests in the real and personal properties taken. The deposit was allocated among the petitioners as follows: $126,500 to Moses; $61,200 to Larson; and $65,300 to Larsonaire. Immediately after the filing of the condemnation suit by the air Force on March 1, 1958, petitioners filed in the United States District Court for the Eastern District of Washington, Northern Division, a pleading in which they claimed that the total value of the properties taken was $8,000,000 and that they were entitled to just compensation to the extent of their interest therein, viz., the difference between $8,000,000 and the total outstanding mortgage indebtedness of $6,185,605. [4] *56 The Secretary of the Air Force, the Federal Housing Commissioner, and the Federal National Mortgage Association (designated "mortgagee") entered into agreements "as of March 1, 1958" and also on May 27, 1958, [5] whereby the Secretary of the Air Force purported to assume the outstanding mortgage indebtedness of each of the petitioners. Petitioners were not parties to such agreements. On April 1, 1958, petitioners surrendered possession of the leased properties to the Air Force. On August 27, 1962, Moses, Larson, and Larsonaire arrived at a settlement of their claims against the Department of the Air Force for the taking of their leasehold properties. The agreement provided a total lump sum settlement of $1,149,640 as just compensation for the taking of their interests in the condemned leasehold. The settlement agreement contained no allocation *57 of the $1,149,640 amount as between the three petitioners. The agreement provided that the $253,000 amount previously deposited with the District Court by the Secretary of the Air Force "shall be credited against the amounts of just compensation fixed herein," leaving a balance of $896,640. On August 31, 1962, the District Court for the Eastern District of Washington, Northern Division, entered judgment awarding petitioners a total of $1,149,640 as just compensation, less the above-described $253,000 deposit. Moses, Larson, and Larsonaire each used the straight-line method of computing depreciation on the leasehold improvements erected by them. The useful lives utilized by each of the petitioners in computing depreciation on the principal assets on which depreciation was claimed by them during the taxable year here in issue were as follows: Moses Lake
Larsonaire
Larson Heights,
Homes, Inc.
Homes, Inc.
Inc.
400 units
200 units
200 units
Buildings - Frame Construction, Rental use
35 years
35 years
35 years
Equipment, Fixed - Ranges and Refrigerators,
Rental use
10 years
10 years
10 years
Equipment, Portable - Shades, Venetian Blinds,
Maintenance Equipment, etc.
5-10 years
10 years
10 years
Sewer and Water System
50 years
50 years
Roadways and Land Improvements - Black-top
streets, concrete sidewalks and curbs and
landscaping
15 years
15 years
15 years
Office Equipment
10 years
*58 The cost of the properties condemned by the Department of the Air Force, the depreciation previously allowable thereon, and the adjusted basis thereof at the beginning of each of the petitioners' fiscal years ended April 30, 1958, and June 30, 1958, were as follows: Prior
Adjusted basis at the
Date
allowable
beginning of the fis-
Petitioner
1957
Cost
depreciation
cal years in issue
Moses
May 1
$3,171,872.45
$636,796.14
$2,535,076.31
Larson
July 1
1,627,074.03
99,506.28
1,527,567.75
Larsonaire
July 1
1,773,648.51
155,291.12
1,618,357.39
On their income tax returns for each of their fiscal years ended April 30, 1958, and June 30, 1958, Moses, Larson, and Larsonaire claimed deductions for depreciation on the properties condemned by the Air Force on March 1, 1958, in the amounts of $98,183.15, $39,802.50, and $42,382.62, respectively. On their income tax returns for their fiscal years ended April 30, 1959, and June 30, 1959, Moses and Larson claimed net operating loss carryover deductions in the amounts of $40,661.45 and $756.04, respectively. In his notices of deficiency, the respondent disallowed in full the above-stated depreciation deductions claimed by petitioners for their fiscal years ended April 30, 1958, *59 and June 30, 1958. The respondent also disallowed the net operating loss deductions claimed by Moses and Larson, respectively, on their returns for their fiscal years ended April 30, 1959, and June 30, 1959, respectively. The disallowance of the net operating loss deductions claimed by Moses and Larson for their fiscal years ended April 30, 1959, and June 30, 1959, respectively, was based upon the respondent's determination that petitioners are not entitled to claim depreciation deductions for their fiscal years ended April 30, 1958, and June 30, 1958. The respondent has not disallowed the depreciation deductions claimed by petitioners for any year prior to their fiscal years ended April 30, 1958, and June 30, 1958. It is unquestioned that, as lessees under three 75-year leases with the Air Force, petitioners had acquired a sufficient economic interest in the leasehold improvements which they erected to be entitled to take depreciation deductions thereon [6] until March 1, 1958. Although Moses retained title to its leasehold and remained in possession throughout at least 10 months of its fiscal year ended April *60 30, 1958, and Larson and Larsonaire each held title to their leasehold estates and retained possession for at least 8 months of their fiscal years ended June 30, 1958, it is the respondent's position that they are not entitled to deduct any depreciation whatever for those years on the depreciable improvements which they constructed. The respondent contends that this is so because by virtue of the condemnation suit commenced by the Air Force on March 1, 1958, petitioners realized "salvage value" at least to the extent of the total amount of the outstanding mortgages ($6,185,605), which amount exceeds their total adjusted basis in the leasehold improvements at the beginning of the years in issue. [7]
*61 Upon commencement of the condemnation suit and the filing of a declaration of taking by the Department of the Air Force on March 1, 1958, title to the leasehold vested in the United States, [8] subject, however, to the outstanding mortgages listed above (note 7, supra). It is well established that for tax purposes such a taking of property for public use through condemnation constitutes an involuntary sale of the property at the time title thereto vests in the public authority. Commissioner v. Kieselbach, 127 F. 2d 359, affd. on other grounds, 317 U.S. 399; 44 West 3rd Street Corporation, 39 T.C. 809, affd, 326 F. 2d 600; Wood Harmon Corporation v. United States, 206 F. Supp. 773, affd. on other grounds, 311 F. 2d 918; cf. Hawaiian Gas Products v. Commissioner, 126 F. 2d 4, affirming 43 B.T.A. 655, certiorari denied 317 U.S. 653. It is not clear from the record whether petitioners realized during the years in issue the amount ($253,000) deposited with the District Court by the Department of the Air Force on March 1, 1958. To be entitled thereto, it was incumbent upon Moses, Larson, and Larsonaire to make application to the District Court and to establish that *62 title to the property was not in question. [9] Otherwise they had no right to receive any part of the deposit. Nitterhouse v. United States, 207 F. 2d 618. It is not shown whether they presented such application and proof to the District Court during the years here in question. It is nevertheless clear that as a result of the involuntary disposition of their leasehold interests the petitioners on March 1, 1958, realized the amounts of the total mortgages outstanding, subject to which their leasehold estates on that date were transferred to the United States Air Force. Crane v. Commissioner, 331 U.S. 1; Parker v. Delaney, 186 F. 2d 455; Wala Garage v. United States, 163 F. Supp. 379. The respondent's contention is that the salvage value of depreciable property is the amount realized from the unexpected disposition thereof at any time, regardless of whether the asset has been used up by petitioners in their trade or business, and regardless of whether or not such asset, at the end of its useful life, could have been sold or demolished by them. He does not claim that petitioners deducted excessive *63 depreciation during years prior to the years in question. The rationale underlying the respondent's position is that inasmuch as petitioners realized from the sale of their leases an amount gerater than their adjusted bases therein at the beginning of the years in issue, they suffered no actual economic loss during those years, but in fact recovered their investments in the improvements through receipt of the sales proceeds. Petitioners, on the other hand, claim that the salvage value of depreciable property is wholly unrelated to the amount realized by an unanticipated disposition thereof prior to the end of its useful life, that the property in question could not realistically be assigned any salvage value, and that under the provisions of section 167(a) of the 1954 Code [10] *64 they are entitled to deduct depreciation during the years in issue, at least until title to the leasehold passed to the Air Force. [11]
A situation almost identical to the facts here presented was involved in a recent decision by the United States District Court for the District of Wyoming in Wyoming Builders, Inc. v. United States, 227 F. Supp. 534 (D. Wyo. 1964), on appeal (C.A. 10, May 28, 1964). The taxpayer there, as here, constructed and operated a Wherry Housing Project on a United States Air Force base. On or about December 28, 1956, the Air Force notified the taxpayer of its intention to acquire all such Wherry projects from their private operators. By an agreement executed August 28, 1958, the taxpayer sold its right, title, and interest in the leasehold estates to the Air Force for $4,436,706.76. At the beginning of the taxable year there in issue the taxpayer's adjusted basis in the leasehold property was $3,158,206.56. The Commissioner disallowed all the depreciation claimed during the year of sale on the ground that, inasmuch as the amount realized from the disposition of the lease *65 exceeded the taxpayer's adjusted basis in the property at the beginning of the year, it had actually recovered its investment in the property by virtue of the sale thereof during that year. In rejecting the Commissioner's contention, the District Court stated: The Government's theory that no depreciation occurred in the year of the sale is patently not based on Section 167 of the Code which does not qualify or eradicate the allowable depreciation according to the effects or results of the sale of the assets of the taxpayer. Depreciation occurs by use; the use of the property by the taxpayer until September 1, 1958, when the sale took place, resulted in a continued depreciation of the property until September 1, 1958. The expense of using the property was properly allocated by the taxpayer to the period of time which was benefited by that asset, that is, from the beginning of the fiscal year in issue until the date of the sale. * * * With respect to the Commissioner's argument that the amount realized ($4,436,706.76) from the sale of the property to the Air Force constituted salvage value, the District Court, after referring to the regulations governing salvage value, [12] commented as *66 follows: The argument that the salvage value is automatically transformed into the actual known sale price is an unreasonable dilation of the concept of the "estimate" required by the regulation. This court will not emasculate the regulation by changing the word "realizable" to "realized." Sec. 1.167(a)-1(e) of the Treasury Regulations does not require that salvage always have a value and that it cannot be a zero value. The regulation merely requires *67 that salvage value be "taken into account" in determining the depreciation deduction. Taking into account salvage value, therefore, as defined in the regulations, it is clear that the facts of this case absolutely preclude the taxpayer from enjoying or anticipating any salvage value. It had to be zero at all times. Under the terms of the lease the property belonged to the government; it could not, therefore, be sold or retired from service, or disposed of by the taxpayer upon his own volition. The taxpayer could not determine that the property was no longer useful to the business of the corporation. Not one of the characteristics of salvage value as defined in Section 1.167(a)-1(c) is present * * * Taxpayer could never expect to receive any amount for the assets by retiring them, discontinuing them, or disposing of them. * * * We have recently reached a conclusion similar to that of the District Court in Wyoming Builders, Inc. v. United States, supra, in our decision in Macabe Company, Inc., 42 T.C. 1105 (Sept. 29, 1964), a case involving an analogous situation. The taxpayer owned an office building which it sold near the close of the taxable year there in question, after holding *68 it for 9 years. It had employed the straight-line method of computing its depreciation allowance on the building, using an estimated useful life of 33 1/3 years and an estimated salvage value of zero. It realized $3,900,000 from the sale of the building on July 25, 1958, which amount exceeded its adjusted basis therein at the beginning of the year of sale. The Commissioner disallowed the depreciation deduction claimed by the taxpayer for the year of sale. We there found that the taxpayer's estimate of a zero salvage value for the building was reasonable and held that under the circumstances presented the amount realized from the sale of the building did not constitute salvage value and that the taxpayer accordingly was entitled to a depreciation deduction in the year of sale. In so holding we pointed out in our opinion that: (1) Depreciation results from the retention and use of an asset rather than from a fluctuation in its market value; (2) The salvage value of an asset is an estimate made by the taxpayer at the time of acquisition and commencement of use, rather than a subsequent adjustment based upon unanticipated sales or market conditions; (3) The salvage value of depreciable *69 property cannot properly be equated with the sales price realized from an unexpected disposition thereof prior to the end of its useful life; and (4) The respondent is prevented by his regulations from adjusting the taxpayer's estimate of salvage value without making a concomitant redetermination of his estimate of the asset's useful life. [13] As we have suggested in our opinion in Macabe Company, Inc., supra, and as the District Court indicated in Wyoming Builders, Inc. v. United States, supra, the most striking difficulty presented by the respondent's position in denying all depreciation claimed for the year of sale is that it is fundamentally inconsistent with the statutory allowance of a deduction for depreciation. Section 167(a) and its predecessors in the revenue acts extending back unbrokenly to the Revenue Act of 1913 represent the statutory embodiment of a universally accepted cost accounting principle, viz., that the business use of property in which a taxpayer has made a capital investment necessarily involves a continuous consumption of capital which should be given accounting and tax recognition as a periodic charge *70 against business income.[14] *71 That the depreciation deduction was intended by Congress to constitute an offset against ordinary income is obvious from the structure of the statute itself which specifically provides for the allowance of a deduction for depreciation from gross income: SEC. 63. TAXABLE INCOME DEFINED. (a) General Rule. - Except as provided in subsection (b), for purposes of this subtitle the term "taxable income" means gross income, minus the deductions allowed by this chapter * * * SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - The essential nature and purpose of the depreciation deduction was described long ago by the Supreme Court in United States v. Ludey, 274 U.S. 295, in which the Court stated: The depreciation charges permitted as a deduction from gross income in determining the taxable income of a business for any year represents the reduction, during the year, of the capital assets through wear and tear of the plant used. The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost. The theory underlying this allowance for depreciation is that by using up the plant a gradual sale is made of it. The depreciation charged is the measure of the cost of the part which has been sold. * * * It is therefore apparent that the purpose of Congress in providing an allowance for depreciation was to permit taxpayers to recover tax free their investment (cost less estimated salvage value) in business assets as an offset against ordinary income. *72 The respondent's contention here, however, as in Wyoming Builders, Inc. v. United States, supra, and Macabe Company, Inc., supra, is bottomed on an entirely different premise, i.e., that the taxpayer may (and must), as a substitute for the depreciation deduction, recover his investment in business property through the receipt of sales proceeds resulting from the unanticipated disposition of the asset prior to the expiration of its useful life. [15] *73 We noted this aspect of the Commissioner's position in our opinion in Macabe Company, Inc., supra, in which we stated as follows: We find merit in petitioner's argument that the granting of a reasonable allowance for depreciation is a matter separate and distinct from the computation of gain upon the sale of property formerly held in the taxpayer's trade or business or for the production of income. The concepts of depreciation through the process of exhaustion, on the one hand, and of appreciation or depreciation because of market conditions, on the other hand, are mutually exclusive. Respondent, however, has sought to equate the two. * * * Clearly when a taxpayer sells an asset in a taxable year in which he has also used it in his business, he has created two separate and distinct events that give rise to different results for tax purposes: (1) The gain or loss realized from the sale normally is accounted for under sections 1002 and 1231 of the Code; and (2) Under section 167(a), the taxpayer is entitled to a deduction from gross income for depreciation. These separate provisions of the Code and their predecessors in prior revenue acts historically have always been regarded by Congress as mutually exclusive in purpose and effect. The receipt of proceeds resulting from the sale of an asset has never (until the Revenue Acts of 1962 and 1964) had anything whatever to do with the depreciation deduction. [16] The depreciation deduction has never been considered to be a charge against gain realized from the disposition of a capital asset, but rather against ordinary income and, contrariwise, the receipt of capital gain has never been regarded as a substitute for *74 the depreciation deduction. During the early years of the revenue acts, which provided an allowance for depreciation (Revenue Acts of 1913, 1916, and 1918), there were no provisions granting special tax treatment for capital gains. With the advent of the capital gain provisions [17] Congress has added no amendments [18] *75 which would indicate any connection between such provisions and the section allowing a deduction for depreciation. [19]
As an offset against ordinary income which is reportable on an annual basis, [20] and as an allowance which by its very nature is dependent upon the passage of time, it is imperative that depreciation be related to the proper taxable period in order accurately to reflect the true cost to the taxpayer of his use of the asset and thereby to disclose correctly his true net income for that period. Massey Motors v. United States, 364 U.S. 92. [21] *76 Accordingly, it is a well-established rule of tax law that a taxpayer must continue to depreciate an asset up until the time of its sale. Virginian Hotel Co. v. Helvering, 319 U.S. 523; Herbert Simons et al., 19 B.T.A. 711; Capital City Investment Company, 4 B.T.A. 933; Even Realty Co., 1 B.T.A. 355. The Commissioner has incorporated this rule in his regulations which provide: (b) The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service. A proportionate part of one year's depreciation is allowable for that part of the first and last year during which the asset was in service. * * * [Sec. 1.167(a)-10(b), Income Tax Regs.] Consequently, by excluding the last year of the petitioners' use from their "period for depreciation," the respondent has contravened his own regulations. To eliminate completely the taxpayer's depreciation deduction for that part of the *77 last taxable year in which the asset was used by the taxpayer in his business, as the respondent has done here, has no justification in law or logic or accounting practice. Furthermore, inasmuch as the respondent has not redetermined the useful life of any asset as to which depreciation was deducted by petitioners, he has disregarded another provision of his regulations, as was pointed out by this Court in Macabe Company, Inc., supra, and by the District Court in Wyoming Builders, Inc. v. United States, supra.Sec. 1.167(a)-1(c), Income Tax Regs., note 12, supra. In addition to our opinion that the respondent's position here is essentially erroneous as a matter of law, it seems clear that, under the lease arrangements here involved, the petitioners of necessity could not have expected to realize any salvage value whatsoever upon the expiration of the useful lives of the improvements in question. As was the case in Wyoming Builders, Inc. v. United States, supra, under the leases in question title to the improvements vested in the Air Force at the time of construction. Petitioners would have been unable to sell or demolish the improvements they erected on the leasehold premises *78 without the express permission of the Air Force. See Rosenblum v. Terry Carpenter, Inc., 62 Wyo. 417, 174 P. 2d 142; Delano v. Tennent, 138 Wash. 39, 244 P. 273. In the event that petitioners had at any time torn down any of the improvements, the remaining scrap and salvage material would have belonged to the Air Force, not to them. If, at the termination of the 75-year leases in question, any of the improvements built by petitioners remained on the property, their leasehold interests therein would have reverted to the Air Force without the retention of any right to reimbursement. See Title & Trust Co. v. Durkheimer Inv. Co., 115 Ore. 427, 63 P. 2d 909. Under the foregoing circumstances the anticipated salvage value of the leasehold improvements in question, as in Wyoming Builders, Inc. v. United States, supra, necessarily had to be zero at all times. Inasmuch as Moses, Larson, and Larsonaire did not hold title to the improvements constructed by them and realistically could have assigned them only a zero salvage value, the situation presented here is factually distinguishable from United States v. Motorlease Corporation, 334 F. 2d 617, reversing 215 F. Supp. 356, and Fribourg Navigation Co., Inc. v. Commissioner, 335 F. 2d 15, *79 affirming a Memorandum Opinion of this Court, as well as Cohn v. United States, 259 F. 2d 371, upon which the respondent relies. In each of those cases the taxpayer had full right of ownership over the assets in question and was free to dispose of them at any time. In view of the factual situation here presented which so clearly discloses that petitioners at the time of construction could not properly have assigned more than a zero salvage value to the depreciable assets involved, we are unable to understand how the respondent can hopefully contend that they actually realized more than $6,000,000 as salvage value. The strange posture in which the respondent, by thus contending, has placed himself brings sharply into focus the false foundation upon which his position rests. Under the authority of Wyoming Builders, Inc. v. United States, supra, and Macabe Company, Inc., supra, we decide this issue for petitioners. The respondent contends in the alternative that in the event we decide that petitioners are entitled to deduct some depreciation for the years in issue, they nevertheless are not entitled to claim any such deduction for the period March 1, 1958 through March 31, 1958, during *80 which they remained in possession of the premises. Although on March 1, 1958, title to the leasehold estates vested in the Department of the Air Force, it is clear that ownership is not a prerequisite to the right to claim a depreciation deduction. Helvering v. Lazarus & Co., 308 U.S. 252. To be entitled to such a deduction, it is only necessary that the taxpayer show that he is in a position to suffer an economic loss in his investment as a result of the diminution in value of the property resulting from use and the passage of time. Weiss v. Wiener, 279 U.S. 333; Duffy v. Central R.R., 268 U.S. 55. As mentioned above, petitioners had actually relinquished title to the depreciable property in question at the time the improvements were added to the premises, long prior to the commencement of the condemnation suit by the Air Force. Yet it is unquestioned that they had acquired a depreciable economic interest in the property at the time of construction, and that they retained such an interest at least until March 1, 1958. After relinquishing title to the leasehold to the Air Force on that date, they remained in possession for one month, operating the housing projects, collecting and *81 retaining rentals, and maintaining the property in the manner contemplated by the leases. Under such circumstances we are of the opinion that Moses, Larson, and Larsonaire retained an economic interest in the depreciable improvements during the period March 1, 1958 to March 31, 1958, and that they are entitled to deduct depreciation on the improvements for that period. Edith Henry Barbour, 44 B.T.A. 1117, reversed on other grounds 136 F. 2d 486, on which respondent relies is clearly distinguishable on its facts. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Larsonaire Homes, Inc., Cliff Mortensen, Liquidating Trustee, Docket No. 90963, and Larson Heights, Inc., Cliff Mortensen, Liquidating Trustee, Docket No. 90964.↩
2. The stipulated date of execution of the Larsonaire lease on August 6, 1953, nearly 2 years prior to its incorporation on July 31, 1955, is not explained by the parties.↩
3. Paragraph 11 of the lease executed by Moses differs somewhat from the provision contained in paragraph 11 of the leases executed by Larson and Larsonaire. Paragraph 11 of the Moses lease states: 11. Upon the expiration of this lease, or earlier termination, all improvements made upon the leased premises shall become the property of the Government without compensation.↩
4. Although the outstanding mortgages of Moses, Larson, and Larsonaire as of March 1, 1958, which were stipulated to be $2,895.26, $1,568,809.02, and $1,701,947.59, respectively, total $6,166,015.87, the parties have stipulated that the total outstanding mortgage indebtedness of the petitioners on that date was $6,185,605. The discrepancy of $19,589.13 is not explained by the record.
5. The agreement executed May 27, 1958, with respect to the mortgage indebtedness of Moses Lake Homes, Inc., referred to its mortgagee as the Institutional Securities Corporation.↩
6. Duffy v. Central R.R., 268 U.S. 55; Gladding Dry Goods Co., 2 B.T.A. 336↩.
7. The amounts which the respondent contends were realized by each of the petitioners during the years in issue in excess of its adjusted basis in the condemned property at the beginning of the year are as follows: ↩
Unpaid balances of mortgages outstanding against lease-
Moses
Larson
Larsonaire
hold acquired by Air Force on March 1, 1958
$2,895,259.26
$1,568,809.02
$1,701,947.59
Deposited with District Court by Air Force as estimated
compensation on March 1, 1958
126,500.00
61,200.00
65,300.00
Total amount realized by petitioners during fiscal years
in issue
$3,021,759.26
$1,630,009.02
$1,767,247.59
Less adjusted basis of property at beginning of fiscal years
in issue
2,535,076.31
1,527,567.75
1,618,357.39
Amount realized by petitioners in excess of adjusted basis
in property at beginning of fiscal years in issue
$ 486,682.95
$ 102,441.27
$ 148,890.20
8. 46 Stat. 1421.↩
9. 69 Stat. 652; 70 Stat. 1111; United States v. 3.08 Acres of Land, Etc., 46 F. Supp. 64↩.
10. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. 11. As is hereinafter more fully explained, petitioners also contend that they are entitled to deduct depreciation until they surrendered possession of the premises to the Air Force on April 1, 1958.↩
12. INCOME TAX REGULATIONS. § 1.167(a)-1. Depreciation in general. * * (c) Salvage. (1) Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life. * * *↩
13. Sec. 1.167(a)-1(c), Income Tax Regs.↩, note 12, supra.
14. A subcommittee of the House Committee on Ways and Means described the depreciation deduction as follows: In the first place, it must be remembered that these amounts deducted from income do not represent cash outgo like wages, repairs, and similar expenses, but are annual reserves generally theoretically set aside to replace plant and property investments. * * * [House Ways and Means Committee, Preliminary Report of Subcommittee, Prevention of Tax Avoidance, Part 1(2) Depreciation and Depletion, 73d Cong., 2d Sess., p. 4 (1933).]
15. Presumably, the gain realized by petitioners from the sale of their leasehold interests to the Air Force, had it been recognized, would have constituted capital gain. Golonsky v. Commissioner, 200 F. 2d 72, affirming 16 T.C. 1450; Louis W. Ray, 18 T.C. 438↩.
16. Appreciation in market value has been held not to affect the depreciation deduction. United States v. Ludey, 274 U.S. 295. In Max Eichenberg, 16 B.T.A. 1368, we held: for the purpose of computing profit from the sale of depreciable property sustained depreciation may not be offset by appreciation in the market value of the property involved. * * * In Even Realty Co., 1 B.T.A. 355↩, we stated, at page 361: There is no reason why wear and tear, purely intrinsic matters, need be tied up to appreciation resulting from extrinsic causes. The two can go on simultaneously and no provision of law requires the one to be offset against the other. * * * 17. Revenue Act of 1921. ↩
18. Prior to the enactment of section 1245 and 1250 of the 1954 Code, which are not applicable to the years before us. 19. In Macabe Company, Inc., supra, we stated: We do not believe that the mere enactment of the predecessor of section 1231↩, which simply provided that gains on the sale or exchange of depreciable property held for more than six months would be considered as capital gains, also changed in any way the previously existing statutory scheme providing for (1) the depreciation of an asset up to the time of sale and (2) the taxation of any gain or loss realized upon the sale of such an asset, as a result of market conditions, pursuant to the applicable provisions relating to gain or loss.
20. Burnet v. Sanford & Brooks Co. 282 U.S. 359↩. 21. In Massey Motors v. United States, supra, the Supreme Court stated: Finally, it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes. * * *