Seas Shipping Company, Inc. v. Commissioner.
Seas Shipping Co. v. Commissioner
Docket No. 3105-62.
United States Tax Court
T.C. Memo 1965-240; 1965 Tax Ct. Memo LEXIS 92; 24 T.C.M. (CCH) 1222; T.C.M. (RIA) 65240; August 31, 1965
*92 1. Petitioner sold 10 ships to Moore-McCormack Lines, Inc., for cash, notes and 300,000 shares of Moore-McCormack stock. Said 300,000 shares constituted 13 percent of Moore-McCormack's outstanding stock thereafter. Held: For purposes of determining petitioner's gain on the sale of its ships, the 300,000 shares received had a value of $30 per share. Moore-McCormack Lines, Inc., 44 T.C. (August 27, 1965), a companion case involving the same question of fact, followed. 2. Held: Petitioner is entitled to a deduction for depreciation, including depreciation on all capitalized improvements, on the vessels sold from the beginning of the taxable year until the dates of sale, even though the sales price was in excess of the adjusted bases of the vessels at the beginning of the year. Macabe Co., 42 T.C. 1105 (1964), on appeal to C.A. 9, February 12, 1965, followed. 3. Held: The cost of "strapping" four vessels was a capital expenditure and not a deductible repair expense. Richard H. Appert, 14 Wall St., New York, N. Y., and David Sachs, for the petitioner. George T. Rita, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent *94 has determined a deficiency in petitioner's income tax for the calendar year 1957 in the amount of $1,476,539.74. The issues for decision are: (1) What was the fair market value, for purposes of computing the correct amount of gain on sale, of a block of 300,000 shares of Moore-McCormack Lines, Inc., stock received by petitioner as part of the consideration for the sale of ten ships to Moore-McCormack Lines, Inc.? (2) Is petitioner entitled to a deduction for depreciation on ten vessels in the year in which those vessels were sold for a price in excess of their adjusted basis as of the beginning of that year? (3) Did the cost of "strapping" four vessels constitute a repair or a capital expenditure? Findings of Fact Some of the facts have been stipulated and are hereby adopted as our findings. The stipulation and exhibits attached thereto are hereby incorporated by reference. Petitioner is a New York corporation with its principal office in New York City. Its 1957 calendar year income tax return was prepared on the accrual basis and filed with the district director of Internal Revenue for the then Lower Manhattan District. Petitioner was engaged, at the time of the transaction *95 involved herein, in the business of owning and operating ships in international commerce. Facts Related to the Sale of Ten Ships to Moore-McCormack Lines, Inc.
Reference is made to the report of the case of Moore-McCormack Lines, Inc., 44 T.C. - (Aug. 27, 1965); all findings of fact in such report under the heading "Facts Common to This Case and to Docket No. 3105-62, Seas Shipping Company, Inc.," are hereby found and such findings are incorporated herein by this reference. Prior to 1957 petitioner operated the Robin Line under a subsidy agreement with the Federal Maritime Board. In late 1956 negotiations between petitioner and the Maritime Board for renewal of the subsidy agreement broke down and petitioner determined that it would have to sell its fleet of ships. Petitioner wished to sell all its ships to a single purchaser who could continue with its established trade routes and would employ the petitioner's employees. After the agreement with Mooremac was reached the parties applied to the Maritime Board for approval of the proposed sale. In its letter of approval, the Maritime Board referred to the Mooremac stock as to be "issued to Seas at $30.00 per share." The petitioner *96 objected to this language in the Maritime Board's letter and, together with Mooremac, sent a telegram to the Board requesting that the letter of approval be amended in such a way as would have eliminated the reference to a $30 price per share. The Maritime Board refused to change its letter, [1] and the petitioner ultimately accepted it upon advice of counsel that the valuation of the shares for tax purposes would not be affected thereby. In conjunction with the proposed sale of ships by petitioner to Mooremac the Ship Valuation Committee of the Federal Maritime Administration was asked to determine whether the proposed prices to be paid by Mooremac were "within the present market values" of the ships to be purchased. In a report of April 10, 1957, the Committee listed the then-current domestic market values as follows: ROBIN LOCKSLEY
$1,300,000
ROBIN SHERWOOD
1,300,000
ROBIN TUXFORD
1,300,000
ROBIN WENTLEY
1,300,000
ROBIN DONCASTER
1,300,000
ROBIN KETTERING
1,300,000
ROBIN GOODFELLOW
1,650,000
ROBIN GRAY
1,650,000
ROBIN HOOD
1,650,000
ROBIN KIRK
1,650,000
ROBIN MOWBRAY
1,650,000
ROBIN TRENT
1,650,000
*97 Without the shareholders' agreement entered into by petitioner and other principal stockholders of Mooremac contemporaneously with the contract of sale, petitioner would not have been assured of any representation on Mooremac's board of directors since the 300,000 shares received represented less than 50 percent of the outstanding stock and Mooremac did not have cumulative voting. The promissory notes of Mooremac received by the petitioner had a fair market value equal to their par or face value. Petitioner took the Mooremac stock under a representation that it was acquiring the shares solely for investment and not with a view to the resale or further distribution thereof. The shares so received were not registered with the Securities and Exchange Commission. The highest price at which Mooremac stock has ever been traded on the New York Stock Exchange is 25 1/4, reached in January and February of 1957. However, the stock has traded as low as 17 in December 1957, and 10 5/8 in 1960. The book value per share and the high and low selling prices on the New York Stock Exchange of the common stock of two other corporations which are also engaged in the business of owning and operating *98 ships in international commerce were as follows at the times indicated: High
Low
Book Value
Selling
Selling
Dec. 31
Price
Price
American Export Lines, Inc.
1956
$53.03
$30 1/8
$17 3/8
1957
59.11
31 1/4
19 1/4
United StatesLines Company
1956
46.65
36 3/4
22 5/8
1957
49.67
37 1/8
22 1/2
The petitioner sold the SS Robin Kettering and the SS Robin Doncaster, the two ships which had been excluded from the sale to Moore-McCormack, to Isbrandtsen Company, Inc., for cash and mortgage notes (at face value) in the aggregate amount of $1,350,000 for each ship. Said mortgage notes had a fair market value equal to their face value and were not disposed of by the petitioner at a discount. The petitioner paid selling commissions in the amount of $40,625 with respect to each of these two ships. Other sales of similar vessels were made at or about the same time at comparable prices. The fair market values of the ships sold by Seas to Mooremac were at least the amounts of the assigned contract values. In its income tax return for 1957 petitioner reported the sale of its fleet of vessels as resulting in a long-term capital net *99 gain of $6,440,627.17. In his notice of deficiency respondent increased the total net gain to $11,305,594.46. A portion of this income was due to respondent's action in placing a value of $39.17 per share on the 300,000 shares of Mooremac stock received by petitioner as part payment for the ships. No explanation for the $39.17 per share valuation ascribed to Mooremac's stock by the respondent is made but it apparently derives from the fact that the stock had a book value of approximately that amount throughout 1957. Finding of Ultimate Fact The 300,000 shares of Mooremac stock received by petitioner as part payment for the ten Robin Line ships sold to Mooremac in 1957 had a fair market value of $9,000,000, or $30 per share. Facts Related to Depreciation in the Year of Sale The 12 ships which were sold by the petitioner [2] were used in its trade or business during the course of the year 1957 from January 1st to the date of sale of each respective ship. From the time of acquisition of the 12 ships, the petitioner adopted a consistent policy of depreciating them, for accounting and tax purposes, on a straight-line basis, using a useful life of 20 years from the date of construction *100 and a salvage value of 2 1/2 percent of cost. Similar depreciation bases are used by owners of similar subsidized vessels. The useful life and salvage values were prescribed under General Order No. 24 of the Maritime Board. In a closing agreement between the taxpayer and the respondent proposed in 1947, such depreciation bases were approved as proper for Federal income tax purposes. In a letter of the respondent dated July 7, 1947, interpreting the closing agreement, it was specifically provided that: It is intended by Article VIII of the closing agreement to provide an annual depreciation rate consistent with the Maritime Commission's treatment of subsidized vessels as having a total useful life of 20 years from construction (Maritime Commission General Order No. 24) or an appropriately higher annual rate for vessels acquired after the expiration of a portion of such life. * * * *101 Under the subsidy agreement between the petitioner and the Maritime Board, the Board would not subsidize any of petitioner's vessels after they were 20 years old. Only once in the history of the petitioner was it permitted to use a vessel longer than 20 years. This was allowed in a shipping emergency in 1939. The Maritime Board permitted the vessel to be used for only one voyage after its twentieth year, in a special amendment to the subsidy agreement in which a finding was made "that a period of actual emergency exists." Petitioner computed depreciation, in accordance with the method described above, for the period from January 1, 1957, to the date of sale of each vessel, and depreciation so computed was deducted in petitioner's 1957 return. This deduction was disallowed by respondent. In 1954 and 1956 petitioner incurred costs with respect to 8 of its 12 ships which subsequently were classified by respondent as capital expenditures without contest by petitioner. No depreciation was taken in petitioner's 1957 income tax return with respect to these capital expenditures incurred in 1954 and 1956, and respondent made no allowance for depreciation on these items in his notice of *102 deficiency. The date of acquisition, original cost bases, dates and amounts of capital improvements, and 1957 depreciation to date of sale for all 12 ships sold in 1957 are summarized in the following table: Date of
Date of
Acqui-
Original
Capital
sition
Cost
Addition
SS Robin Doncaster
2/16/48
$ 1,322,461.32
SS Robin Goodfellow
2/27/47
1,602,568.80
7/ 1/54
SS Robin Gray
7/22/47
1,704,769.84
12/ 1/56
SS Robin Hood
2/25/47
1,660,510.68
SS Robin Kettering
5/13/48
1,334,930.03
7/ 1/54
SS Robin Kirk
12/29/47
2,456,677.79
SS Robin Locksley
3/ 5/41
1,395,344.17
7/ 1/54
SS Robin Mowbray
7/16/48
2,441,011.06
SS Robin Sherwood
7/16/41
1,393,035.31
7/ 1/54
SS Robin Trent
3/31/48
2,458,229.78
6/ 1/56
10/ 1/56
SS Robin Tuxford
9/22/41
1,397,922.16
7/ 1/54
SS Robin Wentley
11/ 3/41
1,390,636.90
7/ 1/54
Totals
$20,558,097.84
1957
1957
Depreci-
Depreci-
ation on
ation on
Adjusted
Original
Capital
Cost of
Bases
Cost to
Additions
Capital
Jan. 1,
Date of
to Date
Addition
1957
Sale
of Sale
SS Robin Doncaster
$ 488,212.83
$ 57,903.46
SS Robin Goodfellow
$ 10,890.00
787,621.32
36,307.29
$ 453.75
SS Robin Gray
49,830.00
788,271.90
46,811.93
3,235.70
SS Robin Hood
810,152.16
40,603.66
SS Robin Kettering
6,639.00
521,081.51
58,162.02
553.28
SS Robin Kirk
1,087,904.08
89,025.90
SS Robin Locksley
10,337.00
370,057.24
32,048.03
738.36
SS Robin Mowbray
1,123,078.89
58,839.86
SS Robin Sherwood
3,755.00
388,690.84
26,922.47
223.50
SS Robin Trent
25,491.09
1,150,784.85
53,164.80
3,515.12
45,161.00
SS Robin Tuxford
14,500.00
410,770.13
32,328.44
1,075.72
SS Robin Wentley
18,704.44
419,906.55
40,382.56
1,356.11
Totals
$185,307.53
$8,346,532.30
$572,500.42
$11,151.54
*103 Facts Related to "Strapping" of Vessels During the year 1957, prior to their sale, petitioner made expenditures for "strapping" four of its ships, as follows: Ship
Cost
SS ROBIN GOODFELLOW
$ 47,000.00
SS ROBIN HOOD
45,000.00
SS ROBIN KIRK
44,074.24
SS ROBIN MOWBRAY
48,217.00
$184,291.24
As a result of an investigation of shipping casualties involving C-3 type vessels the Commandant of the United States Coast Guard, on August 24, 1956, issued a directive requiring "strapping" of certain vessels, including those of the C-3 type operated by petitioner. A ship of the type covered in the Coast Guard directive, presumably even a brand new one, could not be operated in commerce if it were not strapped. "Strapping" consists of the attachment by riveting or welding of a steel band about three feet wide and three-quarters of an inch thick along the sides or deck of a vessel in longitudinal direction. The purpose of strapping is to strengthen the vessel and prevent cracking of the hull. Petitioner in its 1957 return deducted the cost of strapping the four vessels as a "repair" expense. Respondent disallowed the deduction on the ground that strapping constituted *104 a capital expenditure and not a deductible expense. In making the adjustment respondent made no allowance for depreciation of the strapping expenditures in 1957 to the dates of sale of each vessel. Opinion The first issue in this case is a determination of the amount of gain realized by petitioner upon the sale of the Robin Line ships to Mooremac. Gain from sale of property is the excess of the amount realized over the adjusted basis. Section 1001(a), Internal Revenue Code of 1954. The amount realized is the sum of any money received plus the fair market value of property other than money received. Section 1001(b), Internal Revenue Code of 1954. In the instant case petitioner received property other than money in the form of notes and stock in Mooremac. The notes were stipulated to have a fair market value equal to their face value, but there is considerable disagreement between the parties as to the fair market value of the Mooremac stock received. The question of the valuation of this block of 300,000 shares issued by Mooremac to petitioner *105 in partial payment for the purchase by Mooremac of the Robin Line ships has already been considered by this Court in Moore-McCormack Lines, Inc., 44 T.C. - (1965), Docket No. 2887-62. In that case the issue arose as a result of the sale by Mooremac of two of the Robin Line ships shortly after the purchase from Seas, and the necessity to determine the cost basis to Mooremac of these ships which were resold. Since the cost basis was the value of the money and property given up in exchange for the ships it became necessary to determine the value of the shares of Mooremac stock issued in partial payment therefor. We there determined that the shares issued to Seas had a fair market value of $30 per share, as reported by Mooremac. While the record [*] instant case contains evidence not [*] in the Moore-McCormack case [*] tend to support the view of [*] that the value of [*] [*] less than $30 per share, and although we have given independent consideration to all of the evidence in the instant case in isolation from the evidence presented in the Moore-McCormack case, we nonetheless have concluded, and have so found as an ultimate fact, that the Mooremac stock received by petitioner *106 had a fair market value of $30 per share. We do not deem it necessary to restate here the reasons for our determination. An extensive discussion of the relevant factors is set forth in our report of the Moore-McCormack case, and the reasons for concluding as we do on the record in the instant case are in no material respects different than those set forth in Moore-McCormack. [3]
Petitioner here makes three basic arguments in support of its claimed valuation of $19.90 per share. The first of these is a contention that we should consider the effect on market value of the so-called "blockage" involved in the instant situation. "Blockage" is a term used to characterize the depressing effect on the market price of a stock traded on a stock exchange caused by sale of a large block substantially in excess of the normal level of trading. The necessity to liquidate such a block is likely to depress prices because it creates *107 an available supply far in excess of normal demand. Petitioner contends that the value of the block received should be based upon the price that could be received if the block were liquidated in the market and that this price would be below prevailing market prices because of the blockage factor. There is no doubt that the 300,000 shares here involved would depress market prices if liquidated; only 166,000 shares of Mooremac were traded on the stock exchange in all of 1957. However, this fact is of little relevance in the instant situation. Petitioner at no time had either the need or the intention to liquidate the shares received. Its intention was to remove itself from the business of operating a shipping line and to own instead a substantial share of a larger shipping company which would take over its fleet. The contract of sale itself states that Seas was to hold the stock for investment. The collateral stockholders' agreement assuring petitioner representation on Mooremac's board of directors is clearly inconsistent with a contemplated liquidation by petitioner of the shares received. At the time of trial in the instant case petitioner continued to own the Mooremac stock. It *108 is clear in these circumstances that blockage is not a factor in the instant case. Petitioner's expert witness, an investment banker who determined a $19.90 per share value after considering the blockage factor, testified on cross-examination that blockage is not a factor when there is no intent to liquidate the block. [4] In Safe Deposit & Trust Co. of Baltimore, 35 B.T.A. 259 (1937), affd. 95 F. 2d 806 (C.A. 4, 1938), this Court arrived at a valuation below the stock exchange mean price but qualified our findings as follows at page 263: This conclusion has not been arrived at by any dogmatic recognition or non-recognition of any so-called "blockage" rule, i.e., that a large block of shares of one kind is ipso facto to be valued with or without relation to the value of one share in a smaller block. "Blockage" is not a law of economics, a principle of law, or a rule of evidence. If the value of a given number of shares is influenced by the size of the block this is a matter of evidence and not of doctrinaire assumption. In light of the fact that petitioner had neither intention nor need to liquidate the 300,000-share block, we hold that the size of *109 the block in the instant case is evidence not that "blockage" is applicable, but, rather, that the per share value is greater than the mean stock exchange price. Frank J. Kier, 28 B.T.A. 633 (1933). Petitioner's second contention is that the agreement of sale did not determine the fair market value of the shares, even though the shares were assigned a value of $30 in the agreement. We agree that the value assigned in a contract of sale is not necessarily determinative of the actual fair market value. See Carl L. Danielson, 44 T.C. 549 (July 12, 1965). However, when two parties dealing at arm's length assign a value to an item of property being sold or exchanged, and such value has economic significance *110 in the sale or exchange, the value so assigned is very persuasive as to the true fair market value. Elmhurst Cemetery Co. of Joliet v. Commissioner, 300 U.S. 37 (1937), affirming a Memorandum Opinion of this Court; Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957), Simons Brick Co. v. Commissioner, 45 F. 2d 57 (C.A. 9, 1930), affirming 14 B.T.A. 878; Hinkel v. Motter, 39 F. 2d 159 (D.C. Kan., 1930), appeal dismissed, 42 F. 2d 1018 (C.A. 10, 1930). It is by now axiomatic that fair market value is the price that would be paid by a willing buyer to a willing seller, neither acting under any compulsion. Estate of Williams, 256 F. 2d 217 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court, and cases cited therein at footnote 1; Edwin M. Brown, 1 B.T.A. 502 (1925). In the instant case, Mooremac (a willing "seller") and petitioner (a willing "buyer"), assigned a value of $30 per share; there is no evidence to indicate that the parties were not dealing at arm's length or that petitioner was compelled to accept $30the valuation. *111 Petitioner does contend, however, that it accepted the $30 valuation merely as an accommodation to Mooremac, and that it never regarded the stock as actually worth $30 a share. Petitioner's president testified that he was advised by counsel that the $30 valuation figure used in the contract had significance only as a means of allocating the total consideration paid by Mooremac among the ten ships sold to it, and that acceptance of the $3/ valuatio0 would not constitute a determination by petitioner that the stock was actually worth $30 per share for tax or any other purposes. A comparable argument was made in Ullman v. Commissioner, supra, in which the consideration allocable to a covenant not to compete was in question. There the court stated. Petitioners' argument that they never negotiated as to a value for the covenants, thereby implying that the treatment of them was a unilateral action on the part of Consolidated, noticed only casually by themselves, is also without support. Similarly, in the instant case we find petitioner's assertions highly improbable and without support. Under our analysis of the terms of the contract of sale we cannot accept the argument *112 that the $30 assigned value had no economic significance to petitioner and was merely intended as a means for allocating the total consideration among the ten ships. In the contract of sale a dollar value was assigned to each ship, and it was provided that Mooremac stock could be paid to petitioner at a rate of one share for each $30 of assigned value - up to the 300,000 total shares to be issued. The total consideration to be given by Mooremac was 300,000 shares and $4,800,000 in cash and/or notes. The total value assigned to the ten ships sold was $13,800,000. Thus, each share represented $30 of assigned ship valuation. This means that if the values assigned to the ships reflect true values, then the $30 value assigned to each share reflects the true value of the shares, assuming the exchange was a quid pro quo. Despite petitioner's assertions to the contrary, we find no basis in the record to hold that petitioner received anything less than equivalent fair value for the ships sold. The record simply does not support petitioner's contention that its fleet was sold at a sacrifice price. Hence, if the values assigned to the ships sold reflect true market values, the $30 value of *113 the shares to be issued in exchange therefor in a quid pro quo exchange represents the fair value of those shares. We are satisfied from the evidence of record outside of the contract of sale itself that the values assigned to the ships in the contract do in fact represent true fair market values. Petitioner's third argument is that the values of the ships sold are not significant in determining the value of the stock received. Citing several cases, it contends that the value of property given up is not to be referred to in valuing property received in exchange therefor when the property received has a readily ascertainable value of its own, and here the Mooremac stock received has an independent value based on stock exchange prices. Petitioner quotes the following passage from United States v. Davis, 370 U.S. 65, 72 (1962): Absent a readily ascertainable value it is accepted practice where property is exchanged to hold, as did the Court of Claims in Philadelphia Park Amusement Co. v. United States, 126 F. Supp. 184, 189 (1954), 130 Ct. Cl. 166, 172, that the values "of the two properties exchanged in an arms-length transaction are either equal in fact, *114 or are presumed to be equal." (Emphasis added by petitioner.) From this it is argued that where there is a readily ascertainable value for the asset received no reference should be made to the value of the asset given up. The other cases cited by petitioner are not helpful here since they assume that there is a readily ascertainable value for the stock received. If this were the case here this opinion would have been concluded several pages ago. The very problem before us is that the 300,000 shares received by petitioner do not have a readily ascertainable value independent of evidence of the value of the ships given up in arm's-length exchange therefor. [5] We hold that the value of the ships may be considered as evidence of the value of the stock received in exchange therefor. United States v. Davis, supra.
On the basis of the entire record in this case and using our best judgment to weigh and evaluate *115 all of the evidence before us, we have found as an Ultimate Fact and here hold that the fair market value of the block of 300,000 shares of Mooremac stock received by petitioner in 1957 was worth $9,000,000, or $30 per share. Moore-McCormack Lines, Inc., supra. The second issue in this case involves the deductibility of depreciation in the year of sale. Respondent's sole reason for disallowing the depreciation claimed is that the amount received by petitioner for the vessels sold was in excess of petitioner's undepreciated or adjusted basis in the vessels as of the beginning of the year of sale. It is respondent's position that under such circumstances no deduction for depreciation is allowable as a matter of law. In several recent court-reviewed opinions this Court held that there is no such rule of law. Harry Trotz, 43 T.C. 127 (1964); Smith Leasing Co., 43 T.C. 37 (1964), on appeal to C.A. 5, March 5, 1965; Macabe Co., 42 T.C. 1105 (1964), on appeal to C.A. 9, February 12, 1965. We have been able to find nothing in the record before us to indicate that the useful life and salvage values used by petitioner in his depreciation *116 schedules for these vessels were inaccurate or that gain realized by petitioner in connection with their sales did not, in its entirety, result from market appreciation. Harry Trotz, supra. In fact, the depreciation schedules used in this case were prescribed by the Maritime Board and approved by respondent. Respondent has never sought to change either useful life or salvage value, and we must conclude that they were correctly and properly estimated and computed, accurate and reasonable. Respondent relies upon the following authority for its contention that where an asset is sold for a price in excess of its adjusted basis at the beginning of the year no depreciation is allowable to the date of sale. Hertz Corporation v. United States, 364 U.S. 122 (1960); Fribourg Navigation Co. v. Commissioner, 335 F. 2d 15 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court, certiorari granted February 1, 1965; Cohn v. United States, 259 F. 2d 371 (C.A. 6, 1958); Edward V. Lane, 37 T.C. 188 (1961); Randolph D. Rouse, 39 T.C. 70 (1962); Rev. Rul. 62-92, 1962-1 C.B. 29. Of course, we are *117 fully aware that the deductibility of depreciation in the year of sale is currently one of the most avidly discussed controversies in tax law. [6] We do not deem it necessary to render a magnum opus discussing all the prior cases, the arguments typically advanced by both sides, and the theories propounded by the growing array of judges and commentators who have expressed themselves on this issue. Suffice it to say that although this case involves merchant ships, as did Fribourg Navigation, supra, the similarity factually between the two cases is only superficial. In our view, the facts in the instant case are sufficiently different to warrant a different result here than was reached in Fribourg. We believe that petitioner is entitled to deduct depreciation on its vessels used in its business operations during 1957 to produce taxable income that year on the same basis upon which it was allowed without question for former years, and as it would have been allowed for 1957 if no sale of the vessels had occurred. Our determination here is governed by our decision in Macabe Co., supra, and the cases relied upon by respondent are not controlling on the facts before *118 us here for the same reasons the same cases were not regarded as controlling in Macabe.
*119 The factual situation in the instant case is strikingly similar to the facts relied upon by the Eighth Circuit in United States v. S & A Company, 338 F. 2d 629 (C.A. 8, 1964), certiorari applied for January 27, 1965, in holding for the taxpayer, to wit: * * * unanticipated and non-customary sale in mid-life of a depreciable asset; acceptance of the correctness and reasonableness of the taxpayer's acquisition estimates of useful life and salvage value; actual approval of depreciation based on this estimate in prior years, some of which still remained open, and the inescapable inference that the claimed depreciation would have been allowed for the sale year had the sale not taken place * * * We conclude that the depreciation claimed by petitioner and the depreciation on the capitalized improvements is deductible in full. United States v. S & A Co., supra; Harry Trotz, supra; Macabe Co., supra. The final issue for decision is whether the costs incurred by petitioner in 1957 for strapping four vessels are deductible as a repair or must be capitalized. *120 The regulations under section 162 of the 1954 Code set forth the following standards for determining whether an expenditure with respect to a capital asset is deductible as a repair expense or must be capitalized: Section 1.162 Statutory provisions; trade or business expenses. * * *
Section 1.162-4 Repairs. The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. Petitioner places primary reliance on Illinois Merchants Trust Company, 4 B.T.A. 103 (1926), acq. V-2 C.B. 2, and Plainfield-Union Water Company, 39 T.C. 333 (1962), *121 non-acq. 1964-2 C.B. 8, and cases discussed therein. In Illinois Merchants Trust Company, supra, this Court allowed as a repair expense the cost of replacing rotted wooden pilings, upon which a building rested, with concrete pilings to prevent its collapse. In Plainfield-Union Water Company, supra, we held deductible the cost of cleaning and lining cast iron water pipes with cement in order to arrest and prevent a form of corrosion. While we find these cases and several others discussed in Plainfield-Union to be of considerable weight in support of petitioner's position herein, we find all of the authority relied upon by petitioner to be distinguishable from the factual situation present in the instant case. Furthermore, we find that the authority relied upon by respondent is more exactly in point and in many cases indistinguishable from the situation before us. In Marble & Shattuck Chair Co. v. Commissioner, 39 F. 2d 393 (C.A. 6, 1930), affirming 13 B.T.A. 657 (1928), expense incurred in bricking up certain windows for the purpose of strengthening a wall was held to be capital in nature. In Black Hardware Co. v. Commissioner, 39 F. 2d 460 *122 (C.A. 5, 1930), affirming 16 B.T.A. 551 (1929), certiorari denied 282 U.S. 841 (1930), it was held that the cost of raising the floor of a hardware company to protect it against flood was a capital expense. The Fifth Circuit, in affirming, described our opinion as follows (at page 461): * * * the Board of Tax Appeals reached the conclusion that, while the improvements did not prolong the life of the building, nor increase its value as a building, it became more valuable for the use of petitioner in his business, as the improvements are a protection against damage from future storms. The Board held that the raising of the floor and subsequent rearrangement of the fixtures amounted to improvements and betterments, and should be added to the petitioner's capital investment and not be deducted as business expenses for the taxable year. A notable difference between these cases (and others relied upon by respondent, discussed infra) and those relied on by petitioner is that petitioner's cases all involve expenditures to correct an existing defective condition, whereas respondent's cases involve "preventive" improvements. It is true that in Illinois Merchants Trust Co., supra, *123 and Plainfield-Union Water Co., supra, the improvements had the effect of preventing the damage from recurring, or at least arresting its progress. However, it is also true that the improvements corrected existing defects which had to be dealt with. In the cases relied on by respondent there were no existing defects; the improvements were designed not to correct but solely to prevent the future occurrence of a defect. Petitioner in its brief quotes a paragraph from our opinion in Illinois Merchants Trust Co., supra. The following portion of that paragraph is significant here: To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. (Emphasis supplied.) The record in the instant case does not show that any of the ships suffered from any defects prior to strapping. Hence, the strapping did not "restore" or "mend." While petitioner recognizes that the strapping may not have been done to correct an existing infirmity, it claims that the work did not increase the value or prolong the life of the ships *124 and that it was undertaken without choice as a result of a Government directive. The fact that the strapping was done as a result of a Government requirement does not lend any weight to petitioner's argument. In Hotel Sulgrave, Inc., 21 T.C. 619 (1954), we held that the installation of a sprinkler system ordered by the Department of Housing and Building of the City of New York as a safety measure constituted a capital expense rather than a repair. In International Building Co., 21 B.T.A. 617 (1930), we required the capitalization of expenditures made to install safety devices in building elevators under the revised Code of the City of St. Louis. Similarly, the Court held that capitalization was necessary in Lycoming Silk Co., 11 B.T.A. 523 (1928), when exposed wiring was enclosed in cable upon the order of the fire department.[7] While there is no absence of cases which have allowed as deductible repairs, expenditures incurred as a result of public authority requirements, such cases typically involve the correction of already existing infirmities determined by the public authority to be dangerous.
*125 Petitioner lays great emphasis on the alleged fact that the strapping did not increase the value or prolong the life of the ships. It is true that most of the cases, including those relied upon by petitioner, which have held expenditures to be deductible repairs have relied upon the fact that the work did not result in an increase in valuation or prolongation of useful life. However, this does not mean that unless there is an increase in value or useful life the expenditure cannot be a capital expense. This is made clear in several cases. In Hotel Sulgrave, Inc., supra, we stated at page 621: The petitioner contends that the installation of the sprinkler system was a repair which was made for the purpose of keeping the hotel property in ordinarily efficient operating condition and which did not add to the value of the property or prolong its life; and that the expenditure made therefor is an ordinary and necessary business expense deductible in the year ended June 30, 1950. We do not agree that the installation of the sprinkler system constituted a repair made "for the purpose of keeping the property in an ordinarily efficient operating condition." Cf. Illinois Merchants Trust Co., 4 B.T.A. 103, 106, *126 cited by petitioner. It was a permanent addition to the property ordered by the city of New York to give the property additional protection from the hazard of fire. It was an improvement or betterment having a life extending beyond the year in which it was made and which depreciates over a period of years. While it may not have increased the value of the hotel property or prolonged its useful life, the property became more valuable for use in the petitioner's business by reason of compliance with the city's order. The respondent did not err in determining that the cost of this improvement or betterment should be added to petitioner's capital investment in the building, and recovered through depreciation deductions in the years of its useful life. International Building Co., 21 B.T.A. 617, 621, and cases cited therein; Difco Laboratories, Inc., 10 T.C. 660, 669. The same point was clearly made in Black Hardware Co. v. Commissioner, supra. Furthermore, we are not entirely convinced by the record that the strapping operation involved in this case did not increase the life or the value of the ships. We have given full consideration to the entire *127 factual context of the instant case and the abundance of case authority on this question. [8] The issue is not an easy one, but viewing the record as a whole and for the reasons discussed above, we hold that the strapping cost incurred in 1957 was a nondeductible capital expenditure. As stated in our Findings of Fact, even though respondent determined that the strapping cost was a nondeductible capital expenditure, he did not in his notice of deficiency make an allowance for depreciation of this expenditure in 1957, the year the ships were sold. In view of our holding on the second issue in this case, that petitioner is entitled to deduct depreciation on its ships in 1957 up until the date of the sale, petitioner should similarly be allowed a 1957 depreciation deduction on the capitalized strapping cost. This adjustment may be made in the Rule 50 computation. Decision will be entered under Rule 50. Footnotes
1. The record does not indicate why the Maritime Board refused the requested change.↩
2. Including the two ships excluded from the Mooremac sale and later sold to a third party. No issue is raised as to the correct amount of gain on the sale of these two vessels, however, respondent has disallowed depreciation in the year of sale on all 12 vessels sold in 1957, including the two not sold to Mooremac.↩
3. [*$ in Moore-McCormack we [*] facts of record in that [*] part of the record in [*] the absence of such facts in the instant case is not so material as to require a result here different from that reached in Moore-McCormack on the stock valuation question.↩
4. Q. You sell me three hundred thousand and I buy it. We have a willing buyer and a willing seller. You say there is no blockage? A. That is right. Q. The buyer wants to hang on to that because he likes that stock. You still don't have any blockage do you? A. Not if he wants to hold on to it. We are dealing with a problem of realization of fair market value.↩
5. As already discussed, the per share stock exchange price of Mooremac stock does not represent a readily ascertainable value in the instant case because of the very large block involved here, and the fact that the stock exchange market was a very thin one.↩
6. In addition to the cases mentioned in the opinion herein, see Motorlease Corporation v. United States, 334 F. 2d 617 (C.A. 2, 1964), certiorari applied for 11/13/64; Engineers Limited Pipeline Company, 44 T.C. 226 (1965); Bell Lines, Inc., 43 T.C. 358 (1964); Holder Driv-Ur-Self, Inc., 43 T.C. 202 (1964); C. L. Nichols, 43 T.C. 135 (1964), on appeal to C.A. 8; Occidental Loan Co. v. United States, 235 F. Supp. 519 (S.D.Calif., 1964), on appeal to C.A. 9; Killebrew v. United States, 234 F. Supp. 481 (E.D. Tenn., 1964); Wyoming Builders, Inc. v. United States, 227 F. Supp. 534 (D.C.Wyo., 1964), on appeal to C.A. 10; Kimball Gas Products Co. v. United States, an unreported case (W.D. Tex., 1962), on appeal to C.A. 5; Harry Friend, T.C. Memo. 1965-35; Melvon C. Miller, T.C. Memo. 1964-305; Moses Lake Homes, Inc., T.C. Memo. 1964-289; Palmaneda Adams, T.C. Memo. 1964-286; Contra Costa Trucking Company, T.C. Memo. 1963-204; Mulvey, "Cohn Rule - Its Present Day Impact," 53 Taxes 295 (1965); "Depreciation Deduction in the Year of Sale," 33 G.W.L. Rev. 985 (1965); Merritt, "New Cases Clarify Cohn Confusion on Year-of-Sale Depreciation," 21 Jour. of Taxation 324 (1964); "Disallowance of Depreciation in Year of Sale," 50 Va. L. Rev. 1431 (1964); Rothman, "Depreciation in Year of Sale Where Sale Price Exceeds Adjusted Basis of Asset," 62 Mich. L. Rev. 908↩ (1964).
7. See also George Haiss Mfg. Co., 16 TCM 1106↩ (1957), where we held that the cost of safety devices installed pursuant to state law requirements were capital expenditures.
8. For an exhaustive survey of the cases and a useful analytical discussion of the problem, see Wriggins & Gordon, Repairs v. Capital Expenditures, (1958).↩